874 F.2d 1346
 TRI-STATE GENERATION AND
TRANSMISSION ASSOCIATION, INC.,
Plaintiff-Appellant,
and
United States of America, Plaintiff-Intervenor-Appellant,
v.
SHOSHONE RIVER POWER, INC., a Wyoming corporation, et al.,
Defendants-Appellees.
 No. 87-2288.
 United States Court of Appeals,
Tenth Circuit.
 May 5, 1989.
 
 Michael A. Williams of Sherman & Howard, Denver, Colo., and Diane Marshall Ennist of Civil Div., Dept. of Justice, Washington, D.C. (Robert E. Youle, Edward A. Gleason, and Leanne B. De Vos of Sherman & Howard, Denver, Colo., Richard K. Willard, J. Christopher Kohn, Sandra P. Spooner, and Larry R. Steffes of Civil Div., Dept. of Justice, Washington, D.C., and James L. Applegate of Hirst & Applegate, P.C., Cheyenne, Wyo., with them on the briefs), for plaintiff-appellant and plaintiff-intervenor-appellant.
 Stephen S. Walters of Stole, Rives, Boley, Jones & Grey, Portland, Or. (Roy Pulvers and Mark J. Fucile of Stole, Rives, Boley, Jones & Grey, Portland, Or., Stanley K. Hathaway of Hathaway, Speight, Kunz, Trautwein & Barrett, Cheyenne, Wyo., Robert D. Olson of Goppert, Olson & Guill, and C. Edward Webster II, Cody, Wyo., with him on the brief), for defendants-appellees.
 Before McKAY, SEYMOUR and BALDOCK, Circuit Judges.
 McKAY, Circuit Judge.
 
 I. Background
 
 1
 The background of this case is detailed in our previous opinion, reported at Tri-State Generation & Transmission Association, Inc. v. Shoshone River Power, Inc., 805 F.2d 351 (10th Cir.1986) [hereinafter Shoshone I ], which considered Tri-State Generation and Transmission Association, Inc.'s (Tri-State's) appeal from the district court's dissolution of the preliminary injunction in this case. We highlight portions of the background for purposes of this appeal as follows.
 
 
 2
 In 1936 Congress enacted the Rural Electrification Act, 7 U.S.C. Secs. 901-950b (1982 & Supp.1986), which instituted a program designed to provide electric power to rural America. Apparently, Congress was concerned with the fact that those then engaged in the business of generating electrical energy had failed to extend electric service to the rural communities of America and determined that the national interest would be served by subsidizing the rural user of electricity. The Rural Electrification Act created the Rural Electrification Administration (REA) and authorized the REA to make and guarantee loans that would enable rural communities to obtain electric power.
 
 
 3
 In response to the Rural Electrification Act, rural communities across America formed nonprofit electric distribution cooperatives. In 1942 individuals from Park County, Wyoming, organized a distribution cooperative, Shoshone River Power, Inc. (Shoshone). Basically, the consumers of electric power within the geographic area served by Shoshone are the members of Shoshone.
 
 
 4
 After REA-financed distribution cooperatives such as Shoshone were formed, groups of cooperatives banded together to form central generation and transmission cooperatives (G & Ts).[1] This second-level cooperative formation stemmed from an effort on the part of the distribution cooperatives to secure and more economically obtain a long-term source of power.
 
 
 5
 In 1952 distribution cooperatives in Colorado, Nebraska, and Wyoming formed a central G & T, Tri-State, to be "operated on a cooperative, non-profit basis for the mutual benefit of its members."[2] Record, vol. 1, doc. 86, exh. A (Articles of Incorporation, art. IV; Bylaws, art. VII, Sec. 1). Specifically, Tri-State was organized for the purpose of furnishing long-term wholesale power and energy to its member distribution cooperatives who, in turn, funnel the power to their consuming members. Tri-State is comprised of its member distribution cooperatives which are comprised of the actual consumers of the electric power.
 
 
 6
 Although not one of the original distribution cooperatives forming Tri-State, Shoshone became a member of Tri-State in 1958. Like all member distribution cooperatives, Shoshone entered into a long-term wholesale power contract (the all-requirements contract) with Tri-State for electric service. In general, the all-requirements contract provides that Tri-State would sell and deliver to Shoshone, and Shoshone would purchase and receive from Tri-State, all electric power and energy which Shoshone would require for the operation of its system. The contract secures a long-term source of power for Shoshone, assures a stable market for the power produced by Tri-State, and provides a long-term revenue stream with which Tri-State could repay obligations incurred by it on behalf of its members.
 
 
 7
 Shoshone initially agreed that the all-requirements contract would remain in effect for a term of thirty-three years--until December 31, 1991. On June 23, 1965, the contract was replaced by a similar all-requirements contract, under which Shoshone agreed to extend the term of the contract to December 31, 2005. This 1965 contract recites that Tri-State proposed to construct an electric generating plant or transmission system, or both, and that Tri-State would enter into similar all-requirements contracts for electric power with all member distribution cooperatives. The contract also provides that the rate for electric power charged to Shoshone, along with the other member distribution cooperatives, could be revised so that the revenues produced from the all-requirements contracts and other sources would be sufficient to meet the costs of operating and maintaining Tri-State's system and sufficient to make payments on all of Tri-State's indebtedness. The 1965 contract was subsequently modified, Shoshone agreeing most recently in 1977 to extend the term of the contract to December 31, 2020.
 
 
 8
 Getting electric power out to the rural communities was obviously an expensive task. The REA program and formation of central G & Ts made it possible for rural communities to obtain the needed help and financial aid. With the all-requirements contracts in place, the G & T system provided a stable, interdependent network whereby the distribution cooperatives could pool their resources and band together to obtain power at wholesale prices, build central facilities, obtain favorable loans, and attempt to keep costs down. In this respect, notwithstanding a G & T's low equity ratio,[3] it is clear from the record that REA has been willing and authorized to provide and guarantee favorable long-term, low-interest loans to G & Ts inasmuch as REA is able to look to the revenue stream under the all-requirements contracts as an assured source of repayment and security for the loans[4] and as an essential factor to the cohesiveness and financial strength of the G & T systems. Effectually, then, the all-requirements contracts place the financial strength of the distribution cooperatives behind G & T loans.
 
 
 9
 Initially, Tri-State operated as a paper G & T; it owned no generation facilities and acted mainly as a pooling agent to manage more efficiently its members' power allocations. Later, during the 1960's, the member distribution cooperatives anticipated substantial future growth in demand for electricity and projected increased needs. The record is clear that in response to its members' power requirement forecasts and to avert a possible power shortage, Tri-State built generation and transmission facilities, obtaining REA loans and REA-guaranteed loans to do so. The terms of Tri-State's all-requirements contracts with its member distribution cooperatives were extended to match the payment periods of the loans taken out by Tri-State. The record is clear that REA required extensions and the member distribution cooperatives agreed to the extensions so that Tri-State could obtain loans to build the facilities for its members' benefit.
 
 
 10
 After Tri-State built facilities, made substantial capital outlays, incurred debt, and expended funds on behalf of its members, economic conditions changed. The projected growth in demand failed to materialize, and there was an oversupply of electric power. In the early 1980's, Tri-State, like other G & Ts, found itself with stagnant demand, excess capacity, enormous debts to be repaid, and increasing rates being charged to its members.
 
 
 11
 In October 1985, Shoshone entered into a Memorandum of Understanding with PacifiCorp dba Pacific Power & Light Company (Pacific), an investor-owned utility. Pursuant to the Memorandum of Understanding, Pacific offered to purchase substantially all of Shoshone's assets, which include the power-delivery subscriptions of Shoshone's members and some poles and power lines. The sale was subsequently approved by Shoshone's members.
 
 
 12
 Tri-State brought this action to recover monetary damages and enjoin the sale of Shoshone's assets to Pacific. Tri-State claims, among other things, that it is a breach of Shoshone's obligations under the all-requirements contract to sell its assets to Pacific without making provision for the purchase of electric power from Tri-State throughout the remaining term of the contract. Shoshone, on the other hand, claims that selling its assets and ceasing business do not breach its obligations under the all-requirements contract because a sale, which is not expressly prohibited under the contract, would eliminate any power requirement Shoshone may have had under the contract.
 
 
 13
 REA intervened as a plaintiff in this action, subsequently claiming that it would be irreparably damaged if Shoshone is allowed to sell its assets to Pacific.[5] REA sought injunctive relief.
 
 
 14
 Prior to trial, the parties filed cross motions for partial summary judgment, seeking interpretation of the all-requirements contract. The district court granted a portion of Pacific's and Shoshone's motion, ruling that under the contract Shoshone is not required to remain in business or otherwise to purchase power from Tri-State throughout the term of the contract. Rather, according to the district court, Shoshone breaches its contractual obligations only if it eliminates its requirements and ceases business in bad faith.
 
 
 15
 A jury trial was held in April and May, 1987. The jury returned a verdict in Tri-State's favor on every issue, finding, among other things, that Shoshone had breached its implied obligation of good faith and fair dealing and was estopped from selling its assets and going out of business. The jury awarded damages totaling $37 million. The district court ordered Tri-State to remit $31 million of the jury's award or face a new trial. After Tri-State declined to file a remittitur, the district court set aside the jury's verdict and granted Shoshone's and Pacific's motion for a new trial on all issues. The district court also denied Tri-State's and REA's request for a permanent injunction.
 
 
 16
 Tri-State and REA appeal the district court's order denying their request for a permanent injunction. They also appeal the district court's order ruling on the parties' cross motions for partial summary judgment regarding the proper interpretation of the all-requirements contract and the need for REA approval and the district court's orders ruling on post-trial motions and granting a new trial on all issues.
 
 II. Jurisdiction
 
 17
 We must first determine whether or not we have jurisdiction to hear this appeal and, if so, the scope of that jurisdiction. As a general rule, only final decisions of the district courts are appealable. 28 U.S.C. Sec. 1291 (1982). A statutory exception to the finality rule is set forth in 28 U.S.C. Sec. 1292(a)(1) (1982), which provides that courts of appeals shall have jurisdiction of appeals from interlocutory orders "granting, continuing, modifying, refusing or dissolving injunctions...."
 
 
 18
 Tri-State and REA appeal the district court's order which expressly denies their request for a permanent injunction. Although the order is interlocutory,[6] it is appealable under section 1292(a)(1) and reviewable at this stage of the proceedings. Section 1292(a)(1) thus provides us with jurisdiction to hear this appeal.
 
 
 19
 We agree with the Eleventh Circuit in Cable Holdings of Battlefield, Inc. v. Cooke, 764 F.2d 1466, 1471 (11th Cir.1985), that an interlocutory order expressly granting or denying injunctive relief fits squarely within the plain language of section 1292(a)(1). Cases such as Carson v. American Brands, Inc., 450 U.S. 79, 84, 101 S.Ct. 993, 996, 67 L.Ed.2d 59 (1981), and Stringfellow v. Concerned Neighbors in Action, 480 U.S. 370, 107 S.Ct. 1177, 1183-84, 94 L.Ed.2d 389 (1987), which require an additional showing that the interlocutory order might have a "serious, perhaps irreparable, consequence" and that the order can be "effectually challenged" only by immediate appeal, are inapposite. Carson and its progeny do not deal with interlocutory orders that explicitly deny or grant a motion for injunctive relief but with orders that have "the practical effect of refusing an injunction." Carson, 450 U.S. at 84, 101 S.Ct. at 996; see I.A.M. National Pension Fund Benefit Plan A v. Cooper Industries, Inc., 789 F.2d 21, 24 n. 3 (D.C.Cir.) ("Carson does not apply to an order clearly granting or denying a specific request for injunctive relief; such orders are always appealable under Sec. 1292(a)(1)."), cert. denied, 479 U.S. 971, 107 S.Ct. 473, 93 L.Ed.2d 417 (1986); 16 C. Wright, A. Miller, E. Cooper, E. Gressman, Federal Practice and Procedure Sec. 3924 (1977 & Supp.1987) [hereinafter Wright & Miller]. When an order, although not expressly denying or granting an injunction, has the practical effect of doing so, the Carson line of cases extends the coverage of section 1292(a)(1) and allows the order to be appealable under that section, but only if the additional requirements are satisfied.
 
 
 20
 Tri-State and REA have also attempted to appeal other interlocutory orders of the district court under the doctrine of pendent appellate jurisdiction, including an order ruling on cross motions for partial summary judgment and orders ruling on post-trial motions and granting a new trial. First, we are convinced that all reasons underlying the district court's denial of the injunction are reviewable at this time as a matter of law. See, e.g., Takeda v. Northwestern National Life Insurance Co., 765 F.2d 815, 818 (9th Cir.1985); Cable Holdings, 764 F.2d at 1472; Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir.1984) ("We have power ... to review all issues underlying an injunction."); Gould v. Control Laser Corp., 650 F.2d 617, 621 n. 7 (5th Cir. Unit B July 1981); Energy Action Educational Foundation v. Andrus, 654 F.2d 735, 745-46 n. 54 (D.C.Cir.1980), rev'd on other grounds sub nom. Watt v. Energy Action Educational Foundation, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981); Wright & Miller, supra p. 11, Sec. 3921, at 17, 23. Obviously, if we did not have appellate jurisdiction to review matters of law addressed by the district court in its order denying injunctive relief, this court could not properly exercise its jurisdiction under section 1292(a)(1) and resolve the issues pertinent to the permanent injunction claim.
 
 
 21
 We further believe that on appeal from a grant or denial of injunctive relief, this court as a matter of law may justifiably, though cautiously, decide other generally nonappealable legal issues. See, e.g., Thornburgh v. American College of Obstetricians and Gynecologists, 476 U.S. 747, 755-57, 106 S.Ct. 2169, 2175-77, 90 L.Ed.2d 779 (1986) (court of appeals' decision to review applicable law and address merits of the case on appeal from preliminary injunction was proper); Deckert v. Independence Shares Corp., 311 U.S. 282, 287, 61 S.Ct. 229, 232, 85 L.Ed. 189 (1940) (extending appellate jurisdiction to an order denying motions to dismiss when appeal of a preliminary injunction ruling was properly before the court); Energy Action, 654 F.2d at 745-46 n. 54 (court can decide issues closely related to the interlocutory order on appeal); McNally v. Pulitzer Publishing Co., 532 F.2d 69, 73-74 (8th Cir.), cert. denied, 429 U.S. 855, 97 S.Ct. 150, 50 L.Ed.2d 131 (1976); Wright & Miller, supra p. 11, Sec. 3921, at 16-25 (suggesting common-sense approach to deciding issues on which further factual development is unnecessary). "Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by [this court] without further trial court development." Wright & Miller, supra p. 11, Sec. 3921, at 17.
 
 
 22
 In the district court's denial of Tri-State's and REA's request for a permanent injunction, the district court referred to and in part relied on its previous order ruling on cross motions for partial summary judgment that Shoshone does not have an implied obligation to maintain requirements and remain in business. See, e.g., record, vol. 3, doc. 287, at 18, 20-23. This merits determination need not be decided as part of our consideration of the permanent injunction issue because of our determination below that the record presently before us does not support a finding of irreparable harm. Nonetheless, we believe that we have jurisdiction to review this legal determination inasmuch as it was a basis for the district court's determination that the injunctive relief sought was overly broad and thus improper.[7] Also, we think that in the interest of judicial economy, such review is appropriate to avoid unnecessary litigation and delay. Courts are "not required to remand in futility." Thornburgh, 476 U.S. at 757 n. 7, 106 S.Ct. at 2177 n. 7. Indeed, the Supreme Court has stated: "[R]eview of interlocutory appeals was designed not only to permit the defendant to obtain immediate relief but also in certain cases to save the parties the expense of further litigation." Id. at 756, 106 S.Ct. at 2176 (citing Smith v. Vulcan Iron Works, 165 U.S. 518, 525, 17 S.Ct. 407, 410, 41 L.Ed. 810 (1897)). We have before us a sufficiently complete factual and legal presentation from which to address the issues of law decided by the district court on summary judgment. We conclude that the issues can be decided without further development of the record and that it would be a waste of judicial resources not to review the district court's ruling at this time.
 
 
 23
 Contrary to Shoshone's and Pacific's contention, United States v. Stanley, 483 U.S. 669, 107 S.Ct. 3054, 97 L.Ed.2d 550 (1987), does not preclude this court from reviewing the contract issue which was decided on summary judgment and is connected to a determination of the propriety of injunctive relief. We note first that Stanley involved an appeal from a certified order under 28 U.S.C. Sec. 1292(b) (1982 & Supp.1985) and is inapposite to the present appeal.[8] Also, in response to the unique procedural setting in Stanley, the Supreme Court simply determined that when an order is certified by the district court for immediate appeal, the court of appeals has jurisdiction of only that order and cannot review uncertified orders. Furthermore, although the issues raised in the orders were similar, the district court apparently did not refer to or rely on the uncertified orders in addressing the issues raised in the certified order or in arriving at its conclusions. Also, the uncertified orders related to claims against the United States; and the United States was not even a party to the appeal.
 
 
 24
 The line of cases addressing the issue of reviewability of nonappealable matters on appeal from a Cohen v. Beneficial Industrial Loan Corp., 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), collateral order is also inapposite to this case. The Cohen collateral order doctrine allows for the appealability of a non-final order that finally determines a claim completely collateral to the merits of the action and not merged into or affected by a final judgment on the merits, when review after final judgment would be ineffective. In that instance, review is apparently limited to the collateral order and does not extend to nonappealable matters. See Abney v. United States, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977); cf. San Filippo v. United States Trust Co., 737 F.2d 246, 255 (2d Cir.1984) (court exercised discretion to consider otherwise nonappealable issues on appeal from a Cohen collateral order because there was sufficient overlap in the factors relevant to the appealable and nonappealable issues), cert. denied, 470 U.S. 1035, 105 S.Ct. 1408, 84 L.Ed.2d 797 (1985). Since an order appealable under the Cohen collateral order exception is necessarily collateral to the rest of the case, and appeal is only permitted for that very reason, review of unrelated matters or matters affecting the merits of the case does not appear to be suitable--unlike in the appeal of an order granting or denying injunctive relief.
 
 
 25
 We conclude that we have jurisdiction of Tri-State's and REA's appeal of the district court's order denying permanent injunctive relief. Also, we choose to exercise our pendent appellate jurisdiction over the matters of law addressed by the district court in its order denying the injunction. This would include reviewing the district court's determination on summary judgment that Shoshone does not have an implied obligation to maintain requirements and remain in business. Other matters, including whether or not the district court abused its discretion in ordering a remittitur or a new trial, in requiring a new trial on all issues, in setting aside the jury's punitive damage award against Pacific, or in granting defendant H. David Brannon's motion for judgment notwithstanding the verdict, are matters which we consider inappropriate for review at this time. Accord Hewitt v. B.F. Goodrich Co., 732 F.2d 1554, 1555 n. 2 (11th Cir.1984) (appeal of order granting new trial is properly taken after final judgment in new trial); Delano v. Kitch, 663 F.2d 990, 1001 (10th Cir.1981), cert. denied, 456 U.S. 946, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982).
 
 
 26
 III. The District Court's Order Denying Request for
 
 Permanent Injunction
 
 27
 A permanent injunction is appropriate when the remedy at law is inadequate to compensate the injury sustained. The classic remedy for breach of contract is the award of monetary damages. However, if damages at law cannot adequately compensate the injury sustained from the breach or cannot be reasonably measured, then the remedy at law is inadequate and injunctive relief providing for specific performance may be appropriate because of irreparable injury. Cf. Northern Indiana Public Service Co. v. Carbon County Coal Co., 799 F.2d 265, 279 (7th Cir.1986); Holly Sugar Corp. v. Goshen County Cooperative Beet Growers Association, 725 F.2d 564, 570 (10th Cir.1984) ("if damages can compensate [injury sustained,] injunction will not lie"); Blackwelder Furniture Co. v. Seilig Manufacturing Co., 550 F.2d 189, 197 (4th Cir.1977) (quoting Foundry Services, Inc. v. Beneflux Corp., 206 F.2d 214, 216 (2d Cir.1953) (Hand, J., concurring)) ("irreparability of harm includes the 'impossibility of ascertaining with any accuracy the extent of the loss' "); Danielson v. Local 275, Laborers International Union, 479 F.2d 1033, 1037 (2d Cir.1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate."); Gulf & Western Corp. v. Craftique Productions, Inc., 523 F.Supp. 603, 607-08 (S.D.N.Y.1981); Lee v. Brown, 357 P.2d 1106, 1110-11 (Wyo.1960). Injunctive relief, of course, is an extraordinary remedy. Kincheloe v. Milatzo, 678 P.2d 855, 861 (Wyo.1984).
 
 
 28
 Under the circumstances of this case, a permanent injunction is appropriate if (1) Shoshone breaches its contractual obligations to Tri-State by selling its assets to Pacific or is estopped from eliminating its requirements and ceasing business through the term of the all-requirements contract and (2) an award of monetary damages is inadequate to compensate Tri-State or REA (as third-party beneficiary to the contract) for the injury sustained. Although the granting or refusing of injunctive relief rests in the sound discretion of the trial court, accord McKinney v. Gannett Co., 817 F.2d 659, 670 (10th Cir.1987), the exercise of that discretion is subject to review. Goldammer v. Fay, 326 F.2d 268, 270 (10th Cir.1964).
 
 
 29
 Based on the evidence presented at trial, the district court determined that Tri-State has an adequate remedy at law and is not irreparably harmed by a breach of the all-requirements contract. The district court also determined that REA's claim of inadequate legal remedy and irreparable harm is too speculative to permit the issuance of an injunction. Furthermore, according to the district court, the injunction sought by Tri-State and REA cannot be granted because it would enjoin Shoshone from ever selling its assets to Pacific and enjoin Pacific from ever acquiring any Tri-State member. The district court premised this determination on its previous ruling on summary judgment that Shoshone does not have an express or implied obligation under the all-requirements contract to maintain requirements and remain in business.[9] Consequently, the district court denied Tri-State's and REA's request for injunctive relief.
 
 
 30
 Initially, we must determine whether or not the district court's premise was correct that Shoshone does not have an obligation to maintain requirements and remain in business. If Shoshone has such an obligation, the district court erred in granting summary judgment on that issue in favor of Shoshone and Pacific and in relying on that determination in evaluating the propriety of permanent injunctive relief. We must then determine whether or not the district court clearly erred in concluding that Tri-State has an adequate legal remedy and that REA's claim of irreparable harm is speculative. If monetary damages cannot adequately compensate Tri-State, or if REA is irreparably harmed, the district court abused its discretion in denying injunctive relief.
 
 
 31
 A. Shoshone's Implied Contractual Obligation
 
 
 32
 "[I]t is well settled that a contract includes not only what is stated expressly but also that which of necessity is implied from its language." Arch Sellery, Inc. v. Simpson, 360 P.2d 911, 912 (Wyo.1961). When a contract is indefinite on a pertinent aspect of the parties' contractual relationship, it may be appropriate to search the surrounding circumstances in order to ascertain what the parties contemplated at the time of contracting. Accord Mountain Fuel Supply Co. v. Central Engineering & Equipment Co., 611 P.2d 863, 868 (Wyo.1980) (because contract was silent on warranty starting date, court examined the surrounding circumstances); Peters Grazing Association v. Legerski, 544 P.2d 449, 459 (Wyo.1975) (contract may be "considered in light of all the surrounding circumstances, related facts showing relations of the parties, the nature and situation of the subject matter and the apparent purpose in making the contract"). "[T]he fundamental canon of construction applicable to contracts generally is the ascertainment of the intention of the parties." Shellhart v. Axford, 485 P.2d 1031, 1034 (Wyo.1971). Further, a promise that is not expressed in the contract, or an unexpressed condition of an express promise, can be implied when the conduct of the parties reasonably interpreted has expressed the promise. And an unexpressed promise can be put in by construction of law when justice demands it under the circumstances that have arisen. HML Corp. v. General Foods Corp., 365 F.2d 77, 82 (3d Cir.1966) (citing 3 A. Corbin, Contracts Sec. 569, at 339-41 (1960)). In a requirements contract, a gap may be filled by implication if it is "necessary in order that the contract should not be unreasonable or unfair to one of the parties" under the circumstances. Id. at 81.
 
 
 33
 In reviewing the all-requirements contract in this case, we note several aspects of the contract that make it a unique requirements contract. First, it is clear from the contract that the parties are interrelated. Shoshone is specified throughout the contract as a member of Tri-State. This relationship indicates that the all-requirements contract is not a commonplace arm's-length requirements deal between private parties. Second, it is clear from the all-requirements contract that the REA, which is referenced throughout the contract, is materially connected to the contract and the parties' contractual relationship. As an example, the contract, including each supplement to the contract, is not effective or binding on the parties until approved by REA. Indeed, a contract among Shoshone, Tri-State, and REA, which serves as a supplement to the June 23, 1965, contract, specifies that execution of the all-requirements contract is subject to the approval of REA under the terms of the loan contracts entered into with REA. Also, the all-requirements contract provides that the rate schedule and any revision of rates must be approved by REA.
 
 
 34
 The all-requirements contract makes clear that the Tri-State cooperative system was organized by its members for the purpose of furnishing them a long-term source of power. The 1965 contract specifies further that Tri-State expected to construct an electric generating plant or transmission system, or both, for the purpose of supplying electric power and energy to its members. And the contract specifies that Tri-State entered into a similar all-requirements contract with each member of Tri-State. This recital clearly shows the interrelationship of the Tri-State system and its members.
 
 
 35
 The contract also connects Shoshone's purchase of its system's requirements to Tri-State's indebtedness. For example, the 1965 contract specifies that Tri-State can revise the rates charged for electric power so that the revenues produced under the all-requirements contracts are sufficient to make payments on account of Tri-State's indebtedness. Moreover, in 1958 Shoshone agreed to purchase its system's electric power requirements until 1991, agreeing that the contract "shall remain in effect until midnight of the 31st day of December, 1991." Beginning in 1965 and in subsequent years, Shoshone agreed to extend the term of the all-requirements contract, each extension matching Tri-State's new loan repayment period. As noted, the extensions required REA approval.
 
 
 36
 With the most recent extension in effect, Shoshone agreed to purchase the electric power requirements of its system from Tri-State until December 31, 2020. We believe that that promise to purchase requirements for a definite term, especially in light of the extensions and other pertinent provisions in the contract, implies that Shoshone will remain in business and maintain requirements throughout the term of the contract, as long as there are sufficient members in Shoshone's system requiring electric power. We also believe that an agreement to remain in business and maintain requirements must be implied so that the all-requirements contract can be carried out in the way clearly anticipated and not rendered unreasonable to Tri-State and REA.
 
 
 37
 To be sure, the all-requirements contract does not specifically state that Shoshone is to remain in business and maintain requirements. On the other hand, the contract does not state that Shoshone can just eliminate its requirements (even though it has members requiring power) and cease business prior to the end of the agreed-upon term of the contract simply by selling its assets and member subscriptions to Pacific. Because the contract is not clear on this point,[10] we believe it appropriate to review the circumstances surrounding the parties' contractual relationship, including the parties' relationship and their conduct in extending the term of the contract to match loan pay-off periods, to ascertain what the parties contemplated at the time of contracting. Accord Rouse v. Munroe, 658 P.2d 74, 78 (Wyo.1983); Shepard v. Top Hat Land & Cattle Co., 560 P.2d 730, 732 (Wyo.1977).
 
 
 38
 An obligation on the part of the buyer to maintain requirements and remain in business has been implied even in situations involving a requirements contract stemming from an arm's-length business deal between unrelated, private parties. For example, Central States Power & Light Corp. v. United States Zinc Co., 60 F.2d 832 (10th Cir.1932), involved a contract requiring a buyer to purchase a specified amount of gas each day for a set number of years. The contract provided, however, that if the buyer's total daily requirements were less than the specified amount, the buyer was only required to take and pay for the amount of its requirements. Prior to the end of the contract's term, the buyer discontinued operation of its plant. The buyer claimed that it was no longer required to purchase gas from the seller since the buyer was only required to purchase the amount of its total requirements and its total requirements were zero. According to the court, the contract was to be in full force and effect for a definite period; and the closing or discontinuance of the buyer's plant did not eliminate the buyer's liability under the contract. "The [buyer] owning an established business had the implied obligation to continue it in the usual manner, and accept during the time fixed the gas required to so conduct it." Id. at 834. The court then viewed the circumstances under which the parties entered into the contract and determined that the effect of the buyer's contention was that "the [seller] was to go to great expense in preparation to deliver the gas, but the [buyer] was not obligated to take it for any definite time, with the result that, if [buyer] could be rid of the obligation at the end of the period of operation, it could likewise avoid it in one month or one day." Id. According to the court, "[s]urely this would be a most unreasonable interpretation of the contract. And it overlooked the stipulation to take the gas for a certain period; also the expression in the contract of 'requirements' instead of desire or will on the part of the [buyer]." Id.
 
 
 39
 To be sure, the contract in Central States was not a pure requirements contract. Even so, the court noted that the buyer "was not bound to take beyond its requirements." Id. We think the reasoning in Central States may be applied in the present action.
 
 
 40
 In Diamond Alkali Co. v. P.C. Tomson & Co., 35 F.2d 117 (3d Cir.1929), the parties entered into a requirements contract wherein the buyer agreed to purchase its entire requirements of soda ash, caustic soda, and bicarbonate of soda, from the seller over a certain period of time. Also, the seller agreed to sell to the buyer a piece of land on which to erect a new plant. The seller further agreed to loan a certain sum of money to the buyer as needed for the erection of the new plant, and the buyer agreed not to encumber its assets. The buyer agreed not to sell or lease the new plant. While the new plant was being built, the buyer continued to operate its old plant and purchase its requirements from the seller. However, prior to moving into the new plant, the buyer sold its old plant, went out of business, and refused to open or operate the new plant. The issue before the court was whether or not the buyer was obligated to continue in business and buy its requirements throughout the term of the contract.
 
 
 41
 The court noted that there was no express provision in the contract requiring the buyer to continue in business and buy its requirements throughout the term of the contract. Nevertheless, "[t]hat there may be an agreement in which an undertaking not express is imputed to a party because of other undertakings, which are expressed, is undoubted." Id. at 118. The court reviewed the contract and other evidence in the record and determined that the parties anticipated, intended, or implied that the contract was to continue throughout the definite term. The court stated: "There was a period during which it was understood that 'the term of this contract' was to run. There is no intimation that 'the term' was to be other than the five years mentioned." Id. at 119. Likewise, in the present action, there is a definite term under the contract during which it was clearly understood by the parties that the contract was to run.
 
 
 42
 The court in Diamond Alkali stated further:
 
 
 43
 All the negotiations between the parties, the entire contract with all its covenants and the entire enterprise of the parties were based upon the proposed "continuance" of the contract for "the term" of five years. The fulfillment of their undertakings necessarily implied such a continuance. The parties in good faith contemplated performance of the covenants requiring the [buyer] to purchase all its specified supplies from the [seller] for five years and implicit in these negotiations and stipulations was the bona fide operation by the [buyer] of its manufacturing plant ... for that period. The [buyer] did not intend to do otherwise until an unexpected opportunity to make "an advantageous sale" presented itself.
 
 
 44
 Id. at 119. As in Diamond Alkali, it is clear from the record that the all-requirements contract and the entire enterprise of the parties in this case are based on the continuance of the contract throughout the agreed-upon term, especially in light of the cooperative nature of the Tri-State system, the role the all-requirements contract plays in the cooperative venture, and the participation and interrelationship of the individual cooperatives. Clearly, the fulfillment of Tri-State's and Shoshone's undertakings necessarily implies such a continuance. "Whenever a contract cannot be carried out in the way it was obviously expected that it would be carried out without one party or the other performing some act not expressly promised by him, a promise to do that act must be implied." Id. at 119-20. The record is clear in this case: The parties obviously expected that Shoshone would continue purchasing electric power from Tri-State throughout the term of the contract as long as Shoshone had sufficient members requiring electric power. If Shoshone is able to eliminate its requirements by simply transferring its member subscriptions to Pacific, the contract cannot be carried out in the way it was expected. If Shoshone puts itself in a position in which it cannot carry out the all-requirements contract, it breaches the contract.
 
 
 45
 Texas Industries, Inc. v. Brown, 218 F.2d 510 (5th Cir.1955), involved a requirements contract under which the buyers agreed to purchase from the seller all of the lightweight aggregate that the buyers would require for a period of five years. Because the seller's production at its plant was already committed to other customers, it was necessary for the seller to build a new aggregate plant in order to supply the buyers' needs. In determining whether the buyers remained obligated under the contract notwithstanding that they leased the plants to a third party, the court stated: "In our opinion, neither a sale nor lease of the [buyers'] plants, nor an assignment of the contract, by the buyers could in law effectuate a release of their obligations under the contract without the consent of [the seller]." Id. at 512 (emphasis added). According to the court, the contract showed that the requirements of the buyers' plants were the subject matter of the parties' contract and within the parties' contemplation: "The plants have not been sold; they have not been shut down; they have not been dismantled; they have never ceased to operate and to have requirements." Id. Similarly, in the present case, it is quite clear from the all-requirements contract that the requirements of Shoshone's members were the subject matter of the parties' contract and within the parties' contemplation at the time of contracting. Those members have not ceased to have electric power requirements; Shoshone is merely transferring its members' requirements to Pacific.[11]
 
 
 46
 Based on the above analysis, the court in Texas Industries held:[12]
 
 
 47
 In these circumstances, the law ... imposes an implied obligation upon the buyers to keep the plants in operation lest, by disposing of them or shutting them down, the buyers be permitted to destroy the subject matter of the contract, the requirements of the plants, in violation of the intention of the parties that sales and purchases under it would continue for the full term thereof.
 
 
 48
 Id. (determination made on appeal from summary judgment). The court further held that a business situation can necessarily provide a promise "on the part of the buyer to maintain his business or plant as a going concern, and to take its bona fide requirements. 'In other words, this view implies an obligation to carry out the contract in the way anticipated, and not for purposes of speculation to the injury of the other party.' " Id. at 512-13 (quoting Portland Gas Co. v. Superior Marketing Co., 150 Tex. 533, 243 S.W.2d 823, 825 (1951)).[13] Like the buyer in Texas Industries, Shoshone cannot be permitted to destroy the subject matter of the all-requirements contract--the requirements of its members--in violation of the obvious intention of the parties that purchases under the contract would continue throughout the full term of the contract.
 
 
 49
 Although an obligation to remain in business and maintain requirements has been implied in certain situations, we are aware that typically "the buyer in a requirements contract is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business." HML Corp., 365 F.2d at 81. This conventional rule, of course, is based on the self-interest of the buyer to continue a profitable business and have the largest possible requirements; and the rule is recognized in the routine arm's-length requirements deal inasmuch as the seller can adjust the price in proportion to the risk he carries that the buyer will have no requirements.[14]
 
 
 50
 The all-requirements contract in this case, however, is not a routine arm's-length requirements contract between unrelated, private for-profit parties. Shoshone's participation in the Tri-State cooperative system and its interrelationship with Tri-State and the other members of the Tri-State system make the parties' contractual relationship a unique one. The all-requirements contracts which form the Tri-State system are not simple requirements contracts but rather interdependent, joint and mutual contracts with a common purpose of securing the REA loans and thereby effectuating the REA policy to provide the economic means for supplying electricity to rural areas. The case law dealing with the run-of-the-mill requirements contracts between private parties is not dispositive. Indeed, as we have mentioned earlier, "this case arises in an unusual context with no close parallel in the extant cases." Shoshone I, 805 F.2d at 359.
 
 
 51
 Because of the unique circumstances in this case, the all-requirements contract must be viewed in conjunction with the entire cooperative system and REA program, including Shoshone's participation in and relationship to Tri-State, the interdependency of the members in the Tri-State system, the purpose behind the REA program and its connection to the all-requirements contract, Shoshone's realization of benefits at the Tri-State level as a member of an REA-financed cooperative system, the purpose for which Tri-State obtained the REA loans, the reasons for entering into the all-requirements contract, the connection between the contract and Tri-State's indebtedness, the role the all-requirements contract plays in the cooperative system, and the obvious need for an intact system and a continued revenue stream.
 
 
 52
 Based on our review of the contract and the circumstances surrounding the parties' contractual relationship, we are convinced that Tri-State and Shoshone contemplated at the time of contracting and when entering into the cooperative venture that Shoshone would remain in business and continue purchasing the requirements of its members from Tri-State throughout the agreed-upon term of the contract. We are further convinced that each time Shoshone agreed to extend the contract, the parties pre-supposed that Shoshone would provide a revenue stream corresponding to Tri-State's repayment of its debt obligations--obligations clearly incurred on behalf of Shoshone and the other cooperative members of Tri-State.[15] Only through these expectations and the fulfillment of the parties' respective obligations could the cooperative system work. Indeed, the assurance of a long-term source of power and a long-term revenue stream is the very essence of the all-requirements contract and the Tri-State system; and the cooperative nature of the Tri-State system is dependent on the continuance of each member's contract. The contracts also allow the entire system to be viewed as a whole, combining the members' financial strength and increasing their ability to obtain funds, through Tri-State, to build facilities and obtain power in an attempt to meet the members' actual and projected power needs. Shoshone and its members have been able to take advantage of the combined strength of individual cooperatives and the electric power transmitted by Tri-State to the Shoshone service area as a direct result of the federal monies obtained at the Tri-State level. In effect, Tri-State and the federal government through the REA program have made it possible for Shoshone to provide electric power to its members. Selling out prior to the end of the contract would constitute an abuse of the federal program.[16] If Pacific is allowed to purchase Shoshone's member subscriptions, Shoshone is not sharing the burden that has come with the benefits it has received under the REA program; and Pacific would be purchasing assets supported by federal dollars and a ready-made market created by a federal program, without having to assume corresponding obligations. "The sale converts taxpayer bounty to the private profit of Pacific." Id.
 
 
 53
 We hold, therefore, that Shoshone has an implied obligation to remain in business and not to eliminate its requirements, as long as there are members in the Shoshone system requiring electric power. In other words, the fulfillment of Shoshone's contractual undertakings necessarily implies the continuance of Shoshone's system. Otherwise, the contract could not be carried out in the way anticipated and would be rendered unreasonable to Tri-State and the REA. Consequently, Shoshone breaches the all-requirements contract as a matter of law when it attempts to eliminate its requirements by selling its member subscriptions to Pacific and ceasing business. The district court erred in determining that there was no such obligation.
 
 
 54
 Although the all-requirements contract in this case is not a commonplace requirements contract between private parties, we do agree that an unavoidable reduction or elimination of Shoshone's requirements would not be a breach of Shoshone's obligation to remain in business and maintain requirements. As an example of an unavoidable circumstance, the record indicates that cogeneration (where the customer generates its own electricity and does not need to buy from the neighborhood utility) could result in the drastic loss of members and even the cessation of Shoshone's system. Also, because a majority of Shoshone's customers are industrial load customers, the shutting in of oil wells could reduce or even eliminate Shoshone's requirements. And a force majeure (uncontrollable force) may result in the elimination of requirements and cessation of Shoshone's business.[17] If any of these events causes Shoshone to cease existence or eliminate its requirements, that may be a good faith elimination and thus not a breach of Shoshone's contract. However, as a matter of law, we are convinced that when there are sufficient members in Shoshone's system requiring electric power, a sale of Shoshone's assets or member subscriptions to Pacific cannot qualify as a good faith reduction or elimination of requirements.
 
 
 55
 There is no question that at the time of the purported sale there were sufficient members in Shoshone's system requiring electric power. Those members have never ceased to have requirements. Indeed, a sale of Shoshone's assets does not reduce or eliminate Shoshone's requirements for power except in the most technical sense. Only the source of the power changes. Under these circumstances, Shoshone cannot escape its contractual obligations simply by taking its members' requirements out of the Tri-State system and transferring them to Pacific. Cf. Western Oil & Fuel Co. v. Kemp, 245 F.2d 633, 638 (8th Cir.1957) (buyer did not cease to do business in good faith inasmuch as requirements never ceased except in the most technical sense).
 
 
 56
 Inasmuch as we have determined as a matter of law that the sale of Shoshone's assets to Pacific under the circumstances of this case is a breach of Shoshone's implied obligation to remain in business and maintain requirements, a new trial on liability on this issue is unnecessary. Having made this determination, we turn to the adequacy of Tri-State's and REA's legal remedy to determine whether or not the district court abused its discretion in denying permanent injunctive relief.
 
 B. Adequacy of Legal Remedy
 
 57
 We have reviewed the record and believe that monetary damages could likely compensate Tri-State for the injury it would sustain as a result of a breach of Shoshone's contractual obligation. If Tri-State is awarded in damages the present value of what it would have realized over the life of Shoshone's all-requirements contract, Tri-State is presumably made whole under the contract.[18] Other members of the Tri-State system would not be adversely affected by Shoshone's leaving the system because the damages awarded could cover the revenue stream that would have come in under the Shoshone contract. Also, an award of damages reduces the possibility of a "domino effect" (i.e., the likelihood that once Shoshone leaves the Tri-State system, other members will follow suit, resulting in a possible collapse of the entire system). Because Shoshone would be required to pay damages, other Tri-State members no doubt would be discouraged from leaving the system under circumstances similar to the present case because they also would be required to pay for their wrongful elimination of requirements. In other words, we are not evaluating the possible domino effect if Shoshone is freely permitted to sell its assets and leave the system. A permanent injunction cannot be granted simply because Shoshone's leaving the system may result in others leaving. An injunction is appropriate only if Shoshone commits a legal wrong by leaving the system--e.g., a breach of contract--and if the injury sustained from that wrong cannot be adequately compensated. Thus, we are evaluating the possible domino effect if Shoshone breaches its all-requirements contract, pays damages as a result of the breach, and leaves the system. In that instance, we are not persuaded from the record before us that Shoshone's wrongful departure from the system would prompt an exodus of members resulting in the collapse of Tri-State or the irreparability of Tri-State's injury.
 
 
 58
 With regard to REA, we cannot say that REA's security or loan position will be irreparably impaired or that the viability of the whole REA system and the policies implemented through it would be threatened by the sale of Shoshone's assets, if Shoshone is required to pay monetary damages for the wrongful elimination of its requirements. An award of damages to Tri-State would cover the loss of Shoshone's revenue stream which REA looks to as security for the Tri-State loans. Additionally, we cannot say that the district court was clearly erroneous in finding that REA would not be irreparably harmed.
 
 
 59
 Tri-State claims that its legal remedy is inadequate because damages are not calculable or measurable at this time with any reasonable degree of accuracy or certainty. This is the most persuasive of Tri-State's contentions. Cf. Molex, Inc. v. Nolen, 759 F.2d 474, 477 (5th Cir.1985) (irreparable harm includes injuries "for which compensation cannot be measured by any certain pecuniary standard"); Roland Machinery Co. v. Dresser Industries, Inc., 749 F.2d 380, 386 (7th Cir.1984) (difficult to project loss into distant future; incalculability of damages renders legal remedy inadequate); Central Illinois Public Service Co. v. Consolidated Coal Co., 527 F.Supp. 58, 67 (C.D.Ill.) (no adequate remedy at law because damages under long-term requirements contract "will be very difficult of ascertainment"), aff'd, 673 F.2d 1333 (7th Cir.1981); U-Haul International, Inc. v. Jartran, Inc., 522 F.Supp. 1238, 1255 (D.Ariz.1981) ("The difficulty of measuring actual injury to a party is justification itself for granting injunctive relief, since any remedy at law would be inadequate."), aff'd, 681 F.2d 1159 (9th Cir.1982). However, we do not believe that the district court abused its discretion as a matter of law in denying injunctive relief after determining that Tri-State's damages are reasonably calculable based on the evidence presented at trial. In this respect, although damages for breach of a long-term requirements contract may appear to be difficult to ascertain, especially when requirements can vary considerably over a lengthy period of time, we cannot say at this time that the damages in this case cannot be calculated with a reasonable degree of accuracy or that the estimation of damages is so speculative that any award would be inadequate. Cf. U-Haul International, 522 F.Supp. at 1255-56 (measure of injury defies calculation and can be measured only by speculation and conjecture). We reach this conclusion on the record presently before us. Tri-State's own expert witness, Dr. George F. Rhodes, testified that a reasonable estimate could be made, even though it would be difficult to determine Tri-State's exact loss over the term of Shoshone's all-requirements contract. Dr. Rhodes thoroughly explained his method of calculating Tri-State's future "lost profits." He apparently relied on pertinent historical data and the 1986 power requirements study on future load growth and related forecasts, and exhibited no difficulty in making a reasonably accurate calculation of Tri-State's losses. The assumptions and projections based on these data appear to present a plausible basis for calculating the damages Tri-State would suffer. Dr. Rhodes gave a firm opinion that Tri-State's damages would fall within a relatively narrow range and that his calculations were a "reasonable estimate" to a "reasonable degree of economic certainty." Record, vol. 10 (Transcript of Trial Proceedings), at 1667-68. Most importantly, we find nothing in the record to indicate that the calculations made by Dr. Rhodes were not reasonably accurate or that the extent of Tri-State's loss was impossible to ascertain with a reasonable degree of certainty. Dr. Rhodes' expert testimony was uncontradicted.[19] Although the jury did not award the full amount of damages calculated by Dr. Rhodes, this does not necessarily mean, without additional indications of the jury's difficulty in assessing damages, that Tri-State's future damages as a result of Shoshone's leaving the system cannot be reliably measured.
 
 
 60
 As mentioned, the district court relied on the evidence presented at trial in determining that the damages in this case are reasonably calculable. However, since there will be a new trial on the issue of damages,[20] and evidence will necessarily be presented on Tri-State's future damages, the district court may determine after the new trial and upon further consideration of all evidence presented that future damages resulting from a breach of Shoshone's long-term all-requirements contract are too difficult to measure with any reasonable degree of certainty, notwithstanding Dr. Rhodes' testimony. In this respect, evidence concerning Tri-State's future damages is obviously intertwined with and directly affects the determination of whether injunctive relief should be granted because future damages are incalculable. Indeed, the evidence at the new trial may shape up differently and bear out that damages are incalculable. The jury may indicate that it cannot calculate Tri-State's future damages with any reasonable degree of accuracy or that it is having substantial difficulty measuring damages. Such an indication will certainly affect our review on a subsequent appeal if the district court again determines that damages are calculable and consequently denies injunctive relief. We therefore determine it necessary to vacate the district court's order denying the permanent injunction, pending a final determination after the new trial as to whether or not adequate damages are actually calculable in this case. If future damages are not capable of reliable calculation, injunctive relief would be appropriate.
 
 
 61
 Tri-State next contends that effective legal relief cannot be obtained without multiple suits. However, if Shoshone breaches its contractual obligations by leaving the system and is required to pay damages to Tri-State as a result of that breach, we do not see that this would result in numerous suits needing to be instituted to compensate Tri-State for injury sustained as a result of Shoshone's breach. In other words, we do not believe that effective relief for Shoshone's breach can be secured only through the prosecution of multiple lawsuits. Unlike Taylor Ditch Co. v. Carey, 520 P.2d 218 (Wyo.1974), this is not a case where the injury sustained by the same wrong is of a continuing nature. Any future litigation involving the elimination of requirements of other members of the Tri-State system would require a separate evaluation of how and under what circumstances the requirements were eliminated. Also, the extent of Tri-State's or REA's injury will depend on the resulting effect of and the circumstances surrounding the breach.
 
 
 62
 Tri-State also contends that its remedy at law is inadequate because an award of damages is uncollectible inasmuch as Shoshone would cease existence upon selling its assets. However, Pacific has agreed to indemnify Shoshone and hold it harmless with respect to claims, actions, proceedings, or demands which are associated with the sale of Shoshone's assets. As a result of this indemnification agreement, we cannot say, based on the record now before us, that Tri-State will have such difficulty in collecting a damages award against Shoshone so as to render the legal remedy inadequate.
 
 
 63
 Also, we agree with the district court that Pacific is judicially estopped from denying its obligation to pay any judgment rendered against Shoshone. Inasmuch as the application of judicial estoppel in this diversity action goes to the adequacy of Tri-State's legal remedy, we look to the appropriate state law to determine whether judicial estoppel is recognized. See, e.g., Ellis v. Arkansas Louisiana Gas Co., 609 F.2d 436, 440-41 (10th Cir.1979), cert. denied, 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 239 (1980); Reno v. Beckett, 555 F.2d 757, 770 (10th Cir.1977). The parties do not dispute that Wyoming law is the applicable state law in this case. Under Wyoming law, Pacific is judicially estopped from subsequently taking a position inconsistent with its representations in this action to the effect that it will indemnify Shoshone for any damages rendered against Shoshone in this action. See Amfac Mechanical Supply Co. v. Federer, 645 P.2d 73, 79 (Wyo.1982); Gray v. Fitzhugh, 576 P.2d 88, 91 (Wyo.1978). The perceived rejection of judicial estoppel in United States v. 49.01 Acres of Land, 802 F.2d 387, 390 (10th Cir.1986), which is not a diversity case, is inapposite to the present action.
 
 IV. Conclusion
 
 64
 We conclude that the district court erred in determining that Shoshone does not have an implied obligation to maintain requirements and remain in business throughout the term of the all-requirements contract, and in referring to or relying on that determination in concluding that the injunctive relief sought by Tri-State and REA was overly broad and thus improper. We further conclude that Shoshone breached its implied obligation as a matter of law when it eliminated its requirements by selling its assets, including the member subscriptions, to Pacific. Because we so hold, a new trial on the issue of liability is unnecessary.
 
 
 65
 Additionally, we conclude at this time that the district court did not abuse its discretion in denying the permanent injunction based on the evidence before the court. However, because a new trial on damages must still be undertaken, we vacate the district court's order denying the permanent injunction so that the district court can make a final determination after the new trial as to whether or not future damages are actually measurable in this case. If the evidence presented indicates to the court that future damages are not reasonably calculable, permanent injunctive relief would be appropriate.
 
 
 66
 The district court's order denying Tri-State's and REA's request for a permanent injunction is SET ASIDE and VACATED in accordance with this opinion.
 
 
 67
 BALDOCK, Circuit Judge, dissenting.
 
 
 68
 The court has determined that the district court's order denying the permanent injunction sought by Tri-State and the REA should not be reversed, but merely vacated and set aside. This is in the event that the facts later justify entry of permanent injunctive relief. This accomplishes little, other than suggesting a result to the district court. Because the record supports the trial court's decision not to grant permanent injunctive relief, I would not disturb the district court's order. Tri-State and the REA may ask for reconsideration of the order denying permanent injunctive relief without our help.
 
 
 69
 In addition, the court has reviewed an issue (the contract issue) on which the district court granted partial summary judgment. The court decides that the all-requirements wholesale power contract contains an implied obligation for Shoshone to maintain requirements and stay in business over the life of the contract. In reviewing the denial of a permanent injunction, we may have jurisdiction to decide other nonappealable issues; however, such jurisdiction ought to be exercised only when the nonappealable issues are inextricably intertwined with reviewing the propriety of injunctive relief. The contract issue in this case plainly does not meet that test.
 
 
 70
 The purported jurisdictional base for the court's decision on the contract issue is pendent appellate jurisdiction. Even the prevailing view seems to be that this doctrine should be used sparingly and only for the most compelling reasons. See 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3937 at 269-71 (1977). I would not apply the doctrine here because the exercise of such jurisdiction is directly contrary to the district court's decision concerning interlocutory review pursuant to 28 U.S.C. Sec. 1292(b). Though requested to do so, the district court declined to certify the partial summary judgment order containing the contract issue. But the court ignores the district court's decision on this point, and effectively reverses it. Because we have no jurisdiction to review, let alone reverse, the district court's refusal to certify, I would not decide the contract question.
 
 
 71
 Even assuming arguendo that the contract question is properly before us, it should be decided differently because it is doubtful that the Wyoming courts would follow the minority view adopted by this court. The weight of modern authority supports the district court's construction of the contract under Wyoming law and precludes holding Shoshone and Pacific liable as a matter of law based on an implied obligation to stay in business.
 
 
 72
 Even if this court's interpretation of the contract was correct, though, it does not obviate the need for a new trial on some liability issues. For example, the tort claim for interference with contractual relations remains pending and is subject to the district court's new trial order. Yet, the court has restricted the scope of the new trial only to damages. For these many reasons, I respectfully dissent.
 
 I.
 
 73
 Adequate evidence in the record exists to support the trial court's conclusion that a permanent injunction should not issue because Tri-State has not demonstrated irreparable injury. Tri-State's expert quantified damages and the trial court, in ordering remittitur, explained that $16 million of the $22 million in compensatory damages awarded by the jury represented a multiple recovery,[1] clearly supporting the idea that damages can be calculated with reasonable certainty. The trial court also found that the loss of Shoshone from the Tri-State system will not jeopardize the security of Tri-State or the REA. Shoshone contributes only three percent of Tri-State's total revenue from electric power sales. And despite the loss of revenues from Shoshone for nearly a year, Tri-State was able to keep its loans current and implement a 6.5% rate decrease! The trial court discounted the "domino theory" repeatedly advanced by Tri-State and the REA. Essentially, Tri-State has taken steps to bind other cooperatives, and the evidence that other cooperative members will follow Shoshone's lead, given the litigation risk and other factors, is doubtful according to the trial court.
 
 
 74
 Although the evidence is controverted on these points, as an appellate court, we are bound by the factual findings below if they are not clearly erroneous. A finding cannot be clearly erroneous if there is evidence which would support either side. Anderson v. City of Bessemer City, 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). That is the case here. I would affirm the district court's denial of the permanent injunction due to a lack of irreparable injury. This court's rationale for vacating the denial of the permanent injunction--that evidence of future damages on retrial may prove them incalculable--is wholly advisory and unconvincing. The appellants certainly would seek reconsideration of the trial court's decision on this point after retrial if such were the case. We need not school the trial court or the parties on what I suspect is a self-fulfilling appellate prophecy.
 
 II.
 
 75
 The court also decides the contract issue in this case: whether Shoshone has an implied obligation to remain in business or merely an implied duty of good faith and fair dealing which would extend to any decision to discontinue operations and eliminate requirements. Relying on the great weight of authority, the district court opted for the latter interpretation under Wyoming law in granting partial summary judgment on this issue in favor of appellees Pacific and Shoshone. Rec. vol. II, doc. 210 at 4-12. This court opts for the former interpretation.
 
 
 76
 Our jurisdiction to consider this appeal from a denial of permanent injunctive relief arises under 28 U.S.C. Sec. 1292(a)(1) which provides in pertinent part that the court of appeals has jurisdiction of appeals from interlocutory orders of the district courts "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." Consistent with the federal policy against piecemeal appeals, we have jurisdiction to consider those issues raised by the grant, denial or modification of an injunction. When courts have decided issues resolved by other nonappealable orders, it generally has been because those issues are "inextricably bound up with the injunction." Marathon Oil Co. v. United States, 807 F.2d 759, 765 (9th Cir.1986), cert denied, 480 U.S. 940, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). The cases cited by the court are not to the contrary. Maj. op. at 1351-52.
 
 
 77
 In Takeda v. Northwestern Nat'l Life Ins. Co., 765 F.2d 815 (9th Cir.1985), the district court enjoined the plaintiffs from filing another state court action after the original action was removed to federal court and a motion to remand was denied. Id. at 817. In reviewing the propriety of the injunction pursuant to Sec. 1292(a)(1), the court of appeals also resolved the removal questions because "the propriety of the underlying removal is intertwined with the propriety of granting the injunction." 765 F.2d at 818. In the case before us, the court admits that the contract issue simply is not intertwined with the resolution of the injunction question: "This merits determination need not be decided as part of our consideration of the permanent injunction issue because of our determination below that the record presently before us does not support a finding of irreparable harm." Maj. op. at 1352.
 
 
 78
 In Cable Holdings of Battlefield, Inc. v. Cooke, 764 F.2d 1466 (11th Cir.1985), the court of appeals reviewed a grant of partial summary judgment under Sec. 1292(a)(1) because it "was the basis for both the dissolution of the preliminary restraint and the denial of the preliminary injunction." 764 F.2d at 1472. The court concluded that it "could not properly exercise [its] jurisdiction under Sec. 1292(a)(1) without also reviewing the grant of partial summary judgment." Id. That certainly does not describe the situation here. The district court's order denying permanent injunctive relief is firmly grounded on a lack of irreparable injury, rather than its resolution of the contract issue on partial summary judgment.
 
 
 79
 In Sierra On-Line v. Phoenix Software, Inc., 739 F.2d 1415 (9th Cir.1984), the court of appeals declined to review an order denying summary judgment, while noting that under Sec. 1292(a)(1) it had the "power ... to review all issues underlying an injunction." 739 F.2d at 1421. The court determined, however, that the summary judgment denial did not involve the same issues as the injunction. Id. Stated another way, the substance of the summary judgment motion was not one of the "salient issues on review of this injunction." Id. Likewise, the partial summary judgment order on the contract issue in this case is not one of the salient issues for our review.
 
 
 80
 In Gould v. Control Laser Corp., 650 F.2d 617 (5th Cir.1981), the court recognized that it could look at otherwise nonappealable aspects of an order concerning injunctive relief, but declined to review the merits of a summary judgment order. "A litigant's right to appeal interlocutory injunctions goes only to the injunction itself, and he cannot force consideration of the merits of the underlying case except as necessary to review the injunction." 650 F.2d at 621 n. 7.
 
 
 81
 Perhaps the broadest statement of jurisdiction cited by this court may be found in Energy Action Educ. Found. v. Andrus, 654 F.2d 735, 745-46 n. 54 (D.C.Cir.1980), rev'd on other grounds, 454 U.S. 151, 102 S.Ct. 205, 70 L.Ed.2d 309 (1981). According to Energy Action, review of a nonappealable order is appropriate when (1) further factual development is unnecessary, (2) no purpose would be served by delay, (3) judicial economy would be served by deciding the issue, and (4) essential guidance would be furnished on remand. 654 F.2d at 745. The court of appeals concluded its exposition by saying that: "The court, however, must restrict its merits decisions to issues that are closely related to the interlocutory order on appeal." Id. at 745-46 n. 54. The court thus resolved the legal issue that dominated the litigation and was then able to pass on the denial of injunctive relief. Id. at 745.
 
 
 82
 The court also relies upon a discussion of the scope of appellate review of interlocutory orders contained in 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3921 at 16-17 (1977):Ordinarily, the scope of appellate review under Sec. 1292(a)(1) is confined to the issues necessary to determine the propriety of the interlocutory order itself.... Review quite properly extends to all matters inextricably bound up with the remedial decision. In addition, the scope of review may extend further to allow disposition of all matters appropriately raised by the record, including entry of final judgment. Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development.
 
 
 83
 While our jurisdiction should be exercised to resolve those questions "inextricably bound up" with the merits of an injunction, I am not so sure that it should extend to all matters which we happen to think are appropriately raised by the record. While it may be more efficient to decide both appealable and nonappealable issues at once, we must be conscious of the statute which grants us jurisdiction and careful not to displace the decisions of the parties and district court concerning interlocutory review. Specifically, a district court may now direct entry of final judgment as to less than all claims or parties, Fed.R.Civ.P. 54(b), or certify a controlling question of law pursuant to 28 U.S.C. Sec. 1292(b). For this court to decide on an ad hoc basis which nonappealable orders will be reviewed multiplies the opportunity for inconsistent application of our jurisdiction and undermines a sense of certainty so important in the evenhanded administration of justice.
 
 
 84
 As I understand the court's opinion, the basis for reviewing the nonappealable partial summary judgment order is that of pendent appellate jurisdiction. According to this concept, a court "may occasionally decide questions going beyond the obvious limits authorized by the appeal or the petition before it." 16 C. Wright, A. Miller, E. Cooper & E. Gressman, Federal Practice and Procedure Sec. 3937 at 269 (1977). Thus, the contract question is reviewed, not because it is closely related to the injunction issue, but because of concerns of judicial economy.[2] The main feature of the injunction appeal is whether damages are incalculable, not whether the contract imposes liability as a matter of law on Shoshone and Pacific. In the context of this appeal, the two issues are not even closely related.
 
 
 85
 Nor is it clear that judicial economy is better served by deciding the contract issue. The court's decision does not resolve Tri-State's damages claim against Shoshone or Tri-State's damages claim that Pacific tortiously interfered with the contract. A new trial will be required on these issues, and a final decision on the injunction with respect to irreparable harm cannot be made until Tri-State's claims for damages are resolved. In deciding the contract issue at this point, the court has expended far more time than merely deciding the propriety of the district court's denial of the permanent injunction. Had the injunction issue been decided, the case remanded for retrial and then appealed after entry of final judgment, a single appeal containing all of the issues would have followed. To be sure, the court has saved some work for the district court with its resolution of the contract issue, but how much is speculative until we see the appeal that will inevitably follow. Different evidence on retrial likely will prompt Shoshone and Pacific to urge reconsideration of the contract issue, forcing the next panel to revisit the issue.
 
 
 86
 The exercise of pendent appellate jurisdiction involves concerns of limited judicial power, and consistent and principled application of our appellate jurisdiction. See Garner v. Wolfinbarger, 433 F.2d 117, 120 (5th Cir.1970). An ad hoc approach to our jurisdiction is inconsistent with our limited jurisdiction. If permissible at all, pendent jurisdiction is most justified when the appealable and nonappealable issues overlap. General Motors Corp. v. City of New York, 501 F.2d 639, 648 (2d Cir.1974) ("The guiding principle to inform the discretionary application of pendent appellate jurisdiction is whether review of the appealable order will involve consideration of factors relevant to the otherwise nonappealable order."). Ironically, the court's grounds for invoking pendent appellate jurisdiction provide the very rationale that counsels against it. While the exercise of pendent appellate jurisdiction arguably may have efficiency to recommend it, in this case it not only undercuts the district court's discretion to deny certification of an interlocutory appeal under 28 U.S.C. Sec. 1292(b), but also undercuts the district court's efforts to manage the case and bring it to final judgment.
 
 
 87
 We must consider the appealability of the contract issue with respect to the certification process envisioned by 28 U.S.C. Sec. 1292(b), because the district court was requested to certify the partial summary judgment order containing the contract question on that basis. In the alternative, the district court was requested to certify pursuant to Fed.R.Civ.P. 54(b). The district court declined to certify on either ground. This court has no power to overturn a proper exercise of discretion declining to certify the contract question pursuant to Sec. 1292(b) or Rule 54(b). Yet the court has ignored the district court's discretion and completely substituted its own in the guise of pendent appellate jurisdiction.
 
 
 88
 It is very nearly impossible for us to obtain jurisdiction from a denial of certification. The denial of a Rule 54(b) motion is not appealable. McCall v. Deeds, 849 F.2d 1259 (9th Cir.1988); Makuc v. American Honda Motor Co., 692 F.2d 172, 173 (1st Cir.1982) (because only the granting of a Rule 54(b) motion interferes with the policy against piecemeal review, only the grant of the motion is reviewable under the abuse of discretion standard); Boer v. Borg-Warner Corp., 364 F.2d 907 (3rd Cir.1966); Miles v. City of Chandler, 297 F.2d 690, 691 (9th Cir.1961); see also Jeanette Sheet Glass Corp. v. United States, 803 F.2d 1576, 1580-81 (Fed.Cir.1986) (only mandamus would lie from a refusal to certify in an exceptional case). And it is equally doubtful that appellate review may be had of a district judge's refusal to certify pursuant to 28 U.S.C. Sec. 1292(b). In re Master Key Antitrust Litigation, 528 F.2d 5, 8 (2d Cir.1975) (trial judge's refusal to certify issues pursuant to 28 U.S.C. Sec. 1292(b) is not appealable); Pfizer, Inc. v. Lord, 522 F.2d 612, 614 n. 4 (8th Cir.1975) ("This court is without jurisdiction to review an exercise of the district court's discretion in refusing such [Sec. 1292(b) ] certification."), cert. denied, 424 U.S. 950, 96 S.Ct. 1421, 1422, 47 L.Ed.2d 356 (1976); United States v. 687.30 Acres of Land, 451 F.2d 667, 670 (2d Cir.1971) ("We have no jurisdiction to review the trial court's denial of the Sec. 1292(b) certificate."), cert. denied, 405 U.S. 1026, 92 S.Ct. 1291, 31 L.Ed.2d 486 (1972); D'Ippolito v. Cities Serv. Co., 374 F.2d 643, 649 (2d Cir.1967) ("[W]e cannot conceive that we would ever mandamus a district judge to certify an appeal under 28 U.S.C. Sec. 1292(b) in plain violation of the Congressional purpose that such appeals should be heard only when both the courts concerned so desire."). Appellate review of a Sec. 1292(b) denial to certify would undercut the policy embodied in the statute which requires both the district court and the court of appeals to exercise their discretion in favor of interlocutory review. See S.Rep. No. 2434, 85th Cong., 2d Sess. reprinted in 1958 U.S.Code Cong. & Admin.News 5255, 5259 (letter from Judicial Conference of the United States); Milbert v. Bison Laboratories, 260 F.2d 431, 433-35 (3rd Cir.1958) (discussing legislative history). Consent of the trial judge is mandatory. Coopers & Lybrand v. Livesay, 437 U.S. 463, 474, 98 S.Ct. 2454, 2461, 57 L.Ed.2d 351 (1977). In light of the trial judge's express denial of Sec. 1292(b) certification, this court should recognize the limitations of its jurisdiction.
 
 III.
 
 89
 Turning to the merits of the contract issue, the court holds "that Shoshone has an implied obligation to remain in business and not to eliminate its requirements, as long as there are members in the Shoshone system requiring electric power." Court's Opinion at 33. In the appeal from the denial of a preliminary injunction in this case, we tentatively speculated that a routine bilateral requirements contract generally does not imply a good faith responsibility to have requirements, absent a take-or-pay provision or special circumstances. Tri-State Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d 351, 359 (10th Cir.1986). That speculation was in error because the duty of good faith and fair dealing extends to a buyer's decision to maintain requirements, even in a routine bilateral requirements contract. E. Farnsworth, Contracts Sec. 7.17 at 526-29 (1982); Wyo.Stat.Ann. Sec. 34-21-223 (1977) (U.C.C. provision governing requirements contracts). Now, however, the court goes far beyond a buyer's implied duty to make requirements decisions in good faith. Based on Shoshone's participation in the Tri-State cooperative system, and the debt owed by that system to the REA, the court concludes that the contract contains an implied covenant for Shoshone to stay in business for the duration of the contract, so long as its members have a need for power.
 
 
 90
 Notwithstanding the REA's status as a third-party beneficiary, construction of the contract between Tri-State and Shoshone is governed by state, not federal, law because the government is not a party to the contract. See Sam Macri & Sons, Inc. v. United States, 313 F.2d 119, 124 n. 1 (9th Cir.1963) (prime contract with the government is governed by federal law while subcontract between private parties is governed by state law). Even if the contract was considered to be governed by federal law, traditional contract law principles would apply absent contrary legislative direction. Priebe & Sons, Inc. v. United States, 332 U.S. 407, 411, 68 S.Ct. 123, 125, 92 L.Ed. 32 (1947); S.R.A., Inc. v. Minnesota, 327 U.S. 558, 564-65, 66 S.Ct. 749, 754, 90 L.Ed. 851 (1946).
 
 
 91
 In this case, we are dealing with a simple requirements contract. The contract provides in pertinent part:
 
 
 92
 6. GENERAL. The Seller shall sell and deliver to the Member and the Member shall purchase and receive from the Seller all electric power and energy which the member shall require for the operation of the Member's system to the extent that the Seller shall have such power and facilities available; ....
 
 
 93
 Rec. vol. I, doc. 13 (contract of June 13, 1965). At early common law, output and requirements contracts were considered unenforceable due to a lack of mutuality of obligation; a seller might not have any output to sell, or a buyer might not have any requirements to buy. R. Hillman, J. McDonnell & S. Nickles, Common Law and Equity under the Uniform Commercial Code, p 3.07[b][ii] (1985). By applying a doctrine of good faith to such contracts, courts were able to enforce them because the quantity term became more definite when measured against the good faith commercial conduct of the parties. Id. As Judge McKay noted in Big Horn Coal Co. v. Commonwealth Edison Co., 852 F.2d 1259, 1267 n. 11 (10th Cir.1988):
 
 
 94
 Obligations arising under output and requirements contracts are also routinely subjected to good faith limitations because the buyer and seller have "some discretion" to determine their requirements and outputs. E. Farnsworth, Contracts Sec. 7.17, at 528 (1982); see Kansas Power & Light Co. v. Burlington Northern R.R. Co., 740 F.2d 780, 789 (10th Cir.1984), cert dismissed, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 308 (1985) ("courts will imply a promise that the buyer's requirements be in good faith"); Southwest Natural Gas Co. v. Oklahoma Portland Cement Co., 102 F.2d 630, 632-33 (10th Cir.1939) ("Requirements contract imposes upon the buyer the obligation to act in good faith"); see also Lambert Corp. v. Evans, 575 F.2d 132, 137-38 (7th Cir.1978) (provision that buyer agreed to "pay as used" for seller's inventory did not require buyer to use all inventory, but it did imply an obligation of good faith to use inventory amounts dictated by "business judgment" and not merely "to avoid contractual obligations"); HML Corp. v. General Foods Corp., 365 F.2d 77, 81 (3d Cir.1966) ("buyer in a requirements contract is required merely to exercise good faith in determining his requirements").
 
 
 95
 The panel in Big Horn Coal Co. cited Professor Farnsworth's discussion of the rule which states clearly:
 
 
 96
 Unless the parties have provided otherwise, the court will define the obligation to maintain output or requirements in terms of good faith. Any reduction in output or requirements, including the extreme case of a complete cessation on going out of business, must be in good faith.
 
 
 97
 E. Farnsworth, Contracts Sec. 7.17 at 528 (footnotes omitted). Big Horn Coal Co. is also notable because the court affirmed an instruction which allowed the jury to decide whether the buyer had reduced requirements in good faith in accordance with a contractual provision so allowing. 852 F.2d at 1271-73.
 
 
 98
 Whether a court should go beyond implying a duty of good faith and also imply that a buyer will have requirements (stay in business) is hardly a question of first impression. After noting that a requirements contract does not contain a specific quantity term, Professor Corbin explained it as "a promise not to buy such goods of a third party and a return promise to sell and deliver all such goods as the buyer may order in good faith." 3 A. Corbin, Corbin on Contracts Sec. 569 at 338 (1960). He continued:
 
 
 99
 However, another question of interpretation is often raised: Does the buyer promise "by implication" that he will have any needs or requirements, that he will send in orders during the whole stated period for the amount of goods that he has used in the past or that he can use profitably by exercise of ability and diligence, or that he will not fail to keep his business running with its accustomed needs and requirements?
 
 
 100
 Similar questions arise respecting contracts for the purchase and sale of the "entire output" of a factory or mine....
 
 
 101
 In both of these classes of cases the courts have generally answered the questions in the negative. They leave the gap unfilled; no such promises are implied.
 
 
 102
 Id. Recognizing that there may be a gap in the agreement, Professor Corbin was certain that it should not be filled in by the court, however reasonable that might be, because at formation the seller may have been quite willing to trust the buyer without further assurance. Id. Moreover, given the nature of the cooperative system, whether the REA or Tri-State would have insisted on, or Shoshone agreed to, an express provision in the contract requiring Shoshone to stay in business for the life of this contract is subject to serious doubt. Such a potentially oppressive commitment would have scared away all but the most foolhardy distribution cooperatives. And there was little reason for either Tri-State or the REA to insist on such a provision because the implied obligation of good faith was established in the law on the dates this contract was formed (1965) and extended.
 
 
 103
 Professor Williston recognized "the importance of stating clearly the limitation of a bargain of this sort," after reviewing the various lines of authority in the area. 1 W. Jaeger & S. Williston, A Treatise on the Law of Contracts, Sec. 104A at 409-11 (3d ed.1957). Even where courts have recognized an implied in fact promise made by a buyer to stay in business and to take requirements, there still is a recognition that the buyer may in good faith cease to have requirements. Id. at 408-11.
 
 
 104
 In this instance, the district court correctly recognized, as it would appear from Big Horn Coal Co., that
 
 
 105
 the obligation to remain in business for the period of the contract is not a separate and distinct obligation from that of Shoshone's duty to act in good faith and deal fairly under the contract. Rather, any obligation which Shoshone or any buyer may have to remain in business must go hand in hand with the duty of good faith. If Shoshone's decision to sell its assets and cease business under all the facts and circumstances was made in bad faith, then a breach of the contract has occurred.
 
 
 106
 Rec. vol. II, doc. 210 at 8. Whether a requirements contract is analyzed under the U.C.C.[3] or the common law, the general rule is "that a requirements buyer does not undertake to manage his business in such a way as to establish or maintain any particular level of requirements." Lambert Corp. v. Evans, 575 F.2d 132, 138 (7th Cir.1978); In re United Cigar Stores Co., 72 F.2d 673, 675 (2d Cir.) ( [T]he obligation on the part of a buyer in a requirements contract to continue to have requirements without substantial variance is not to be implied more strictly than to impose upon him the obligation to act in good faith."), cert. denied, 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706 (1934). Accord 1 A. Squillante & J. Fonesca, The Law of Modern Commercial Practices Sec. 3.87 at 352 (rev. ed. 1981) ("Generally, the buyer in a requirements contract does not impliedly promise that he will have needs in order to fulfill his requirements contract.").
 
 
 107
 In HML Corp. v. General Foods Corp., 365 F.2d 77, 81 (3d Cir.1966), the court, in discussing a requirements contract, said:
 
 
 108
 The choice lies between implying a promise to correct an apparent injustice in the contract, as against holding the parties to the bargain which they have made. The latter alternative has especial force where the bargain is the result of elaborate negotiations in which the parties are aided by counsel, and in such circumstances it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it.
 
 
 109
 ....
 
 
 110
 The better view, however, is that generally the buyer in a requirements contract is required merely to exercise good faith in determining his requirements even to the extent of a determination to liquidate or discontinue the business. The rule is based on a reliance on the self-interest of the buyer, who ordinarily will seek to have the largest possible requirements. Protection against abuse is afforded by penetrating through any device by which the requirement is siphoned off in some other form to the detriment of the seller.
 
 
 111
 (emphasis added). Accord 1 A. Squillante & J. Fonesca, Williston on Sales Sec. 10-4 at 386 (1973) ("Where the buyer has no needs and terminates his business, thereby simultaneously terminating the contract, the court, in making a determination as to liability of the buyer, will look to the good faith of both of the parties to the requirements contract.")[4] ; E. Farnsworth, Contracts Sec. 7.17 at 526-29.
 
 
 112
 Although the court acknowledges this rule, as it did in Big Horn Coal Co., it finds it inapplicable because the rationale for the rule purportedly does not apply to this situation. Court's Opinion at 29. The rule does apply; however, it just does not go far enough for the court. Although a buyer normally will maximize requirements consistent with self-interest, as the above passage from HML Corp. makes clear, "the requirement of good faith is the means by which this is enforced." HML Corp., 365 F.2d at 81. Thus, a buyer who eliminates requirements by going out of business may be held liable for damages under the requirements contract, if the circumstances indicate bad faith.
 
 
 113
 Of course, when a buyer reduces or eliminates his requirements from a particular seller, the good faith inquiry is a factual one and the burden is on the seller to prove bad faith. A "buyer's duty to continue in business ... is a matter calling for close scrutiny of motives." 1 R. Alderman, A Transactional Guide to the Uniform Commercial Code at 75 (1983). Indeed, because good faith encompasses the requirement that a party act honestly, circumstantial evidence is essential "to see what he actually had in mind when he did what he did." 2 W. Hawkland, U.C.C. Series Sec. 2-306:02 at 222 (1984).
 
 
 114
 Absent a provision to the contrary, a requirements contract precludes a buyer from purchasing requirements from other than the seller. 3 Corbin on Contracts Sec. 569 at 338; R. Anderson, Anderson on the U.C.C. Sec. 2-306:33 at 526 (1982). Thus, a buyer's reduction or elimination of requirements merely to procure requirements more cheaply elsewhere is classic bad faith. J. White & R. Summers, Uniform Commercial Code Sec. 3-8 at 125 (2d ed. 1980) ("Of course, if it transpires that the buyer is actually procuring his requirements more cheaply elsewhere, this is bad faith, and the courts will find that it constitutes a breach."). But there are situations in which decreasing or eliminating requirements may well be consistent with good faith. See, e.g., Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., 130 F.2d 471, 473-74 (3rd Cir.1942) (shutdown of plant due to lack of demand for product); In re United Cigar Stores, 72 F.2d 673 (bankruptcy eliminated requirements).
 
 
 115
 Application of the good faith rule is perfectly adequate for this case. The jury in this case had little difficulty finding Shoshone and Pacific liable under the good faith requirements standard. Perhaps on retrial no reasonable jury could fail to find bad faith given that Shoshone's customers essentially seek to purchase their requirements from Pacific. See Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333, 1341 (1988) (liability determination upheld despite erroneous jury instruction because no reasonable jury could fail to find bad faith); E. Farnsworth, Contracts Sec. 7.17 at 527 ("Some conduct, such as subterfuge and evasion, clearly violates the duty [of good faith]."). The court simply goes too far when it reads into this contract an implied obligation of Shoshone, the buyer, to stay in business for the life of the contract. At this stage, the jury system should be allowed to determine liability by applying the duty of good faith and fair dealing to the facts.
 
 
 116
 Of course, the most serious problem with finding that the buyer has an obligation to remain in business is that no such language appears in the contract and this court-supplied obligation goes far beyond the duty of good faith and fair dealing implicit in every contract. As noted, it is unlikely that the parties ever intended to include such a term. If there is one consistent theme in the Wyoming decisions concerning contract interpretation, it is that unambiguous contracts[5] are not to be rewritten by the court in the guise of interpretation. See, e.g., Arnold v. Mountain West Farm Bureau Mutual Ins. Co., 707 P.2d 161, 166 (Wyo.1985); Adobe Oil & Gas Corp. v. Getter Trucking, Inc., 676 P.2d 560, 562 (Wyo.1984); Rainbow Oil Co. v. Christmann, 656 P.2d 538, 545 (Wyo.1982); McCartney v. Malm, 627 P.2d 1014, 1020 (Wyo.1981); Quin Blair Enterprises, Inc. v. Julien Constr. Co, 597 P.2d 945, 951 (Wyo.1979); see also State Farm Mutual Auto Ins. Co. v. Petsch, 261 F.2d 331, 335 (10th Cir.1958) (applying Wyoming law). And that is what the court is doing here for an ironclad result. The REA and Tri-State could have achieved the greater protection the court provides by including a take-or-pay provision in the contract, or a provision preventing the buyer from selling its business, or a provision making the contract binding on the buyer's successors or assigns. See Tang Tranh Trai Le & E. Murphy, Sales and Credit Transactions Handbook Sec. 2.13 (1985) (express terms concerning quantity variation may be desirable in requirements contract to limit seller's risk); L. Mandel, The Preparation of Commercial Agreements at 214 cl. 3 (take-or-pay provision example).
 
 
 117
 At the date of contract formation in 1965, the REA and Tri-State already had the protection of the good faith requirements rule. Merely because another provision offers greater protection in hindsight is not sufficient reason to go beyond the contract in this case. Implied provisions in contracts are unnecessary when the contract makes sense as written. The interdependent nature of the Tri-State system and long-term security for Tri-State's REA loans do not convince me that an implied provision to stay in business was ever intended. Indeed, almost any time a buyer decreases or eliminates requirements, the seller's other customers and creditors may be affected. No good reason exists to elevate the REA and Tri-State above the rule for ordinary litigants.
 
 
 118
 The good faith requirements rule has flexibility and precedent to recommend it. It is "an important limitation which prevents [the buyer] from acting unreasonably or dishonestly." 2 W. Hawkland, U.C.C. Series Sec. 2-306:01 at 221. The rule that the court crafts is unnecessary and is overly broad, as is evident by the court's attempt to qualify it. Court's Opinion at 31 n. 15, 33-34. Also, by holding Shoshone and Pacific liable as a matter of law, the court replaces what ought to be a factual inquiry (good faith) for a legal one. In discussing an exclusive dealing contract under the U.C.C., Wyo.Stat.Ann. Sec. 34-21-223 (1977), the Wyoming Supreme Court quoted the entire section, which also recognizes output and requirements contracts, and concluded that "this section creates an inherent question of fact." Meuse-Rhine-Ijssel Cattle Breeders of Canada, Ltd. v. Y-Tex Corp., 590 P.2d 1306, 1310 (Wyo.1979) (overturning grant of summary judgment). Yet the court ignores such authority. Deciding the contract issue as a matter of law at this stage seems inconsistent with Wyoming law and unnecessarily augments our appellate power at the expense of the jury.
 
 
 119
 Thus, I would uphold the district court's denial of the permanent injunction and remand the case for a new trial on all issues as envisioned by the district court.
 
 
 
 [1]
 Upper Missouri G & T Electric Cooperative, Inc. v. McCone Electric Co-op, Inc., 160 Mont. 498, 503 P.2d 1001 (1972), details the banding together of a group of electric distribution cooperatives to form a central generation and transmission cooperative in order to secure a long-term source of power to avert a power shortage
 
 
 [2]
 Likewise, the preamble to Tri-State's Articles of Incorporation states that the members "voluntarily associate [themselves] together for the purpose of forming" Tri-State. Article II provides further that Tri-State was established by the members in part to generate and acquire electric energy for the members only. Article II authorizes Tri-State to sell energy to nonmembers for the ultimate benefit of its members and to construct facilities to carry out its objectives
 
 
 [3]
 Rather than having to build its equity, a G & T is able to operate on a very small margin, thereby passing the savings on to its members. Normally, a highly leveraged company is a credit risk and must pay premium interest rates, if it is able to borrow at all. Because all-requirements contracts allow the REA and the financial market to view G & Ts and their member distribution cooperatives as an integrated whole, reasonable and necessary financing can be made available to G & Ts despite the small equity margin
 
 
 [4]
 To make loans to G & Ts for the purpose of financing the construction and operation of generating plants and electric transmission and distribution lines or systems for the furnishing of electric energy to rural communities, REA must first determine that the security for the loan is "reasonably adequate" and that the loan will be repaid within the time agreed. 7 U.S.C. Sec. 904 (1982). It cannot be seriously disputed that the all-requirements contracts within the G & T systems provide an essential source of "reasonably adequate" security for the REA loans
 
 
 [5]
 In an order dated April 17, 1987, the district court determined on cross motions for partial summary judgment that REA is a third-party beneficiary of the all-requirements contract between Tri-State and Shoshone
 
 
 [6]
 The district court's order expressly denying Tri-State's and REA's request for a permanent injunction is not a final order inasmuch as the district court ordered a new trial. The district court has not directed the entry of a final judgment pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, nor has the court certified any order for interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(b) (1982 & Supp.1985)
 
 
 [7]
 We note, too, that this case proceeded to trial on the basis of the district court's ruling on summary judgment and that the district court relied on the evidence presented at the trial in denying the injunction
 
 
 [8]
 Our position that the resolution of the pendent appellate jurisdiction issue on an appeal from a certified order is not applicable to an appeal from an order granting or denying injunctive relief is somewhat confirmed by the fact that the Supreme Court in Stanley does not mention Thornburgh, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779, decided only a year before Stanley, in which the Supreme Court approved the court of appeals' decision to address the merits of the case on appeal from a preliminary injunction
 
 
 [9]
 In its order denying the permanent injunction, the district court also referred to and relied on its determination on summary judgment that Shoshone does not have to seek REA's approval of the sale since Shoshone's direct debts to REA have been paid in full. We agree with the district court that the plain language of 7 U.S.C. Sec. 907 (1982) does not require Shoshone to obtain REA approval prior to selling its assets when its direct debts to REA are repaid. It is clear from the record that Shoshone is not individually liable for any portion of the Tri-State debt owing to REA. Public Utility District No. 1 v. United States, 417 F.2d 200 (9th Cir.1969), which involves a unilateral state condemnation of a portion of an REA-financed cooperative system without REA approval, is not on point
 
 
 [10]
 We do not agree with the district court's legal determination that the all-requirements contract unambiguously spells out Shoshone's obligations on this point
 
 
 [11]
 Nothing in the record suggests that if Shoshone is not permitted to leave the Tri-State system, it could not remain a viable distribution cooperative fulfilling its members' needs
 
 
 [12]
 Although the court in Texas Industries looked to Texas law, we believe the conclusion and rationale in that case would be followed by the Wyoming courts
 
 
 [13]
 The court in Texas Industries, 218 F.2d at 513, briefly discusses three cases in support of its position: Wells v. Alexandre, 130 N.Y. 642, 29 N.E. 142 (1891), Great Lakes & St. Lawrence Transportation Co. v. Scranton Coal Co., 239 F. 603 (7th Cir.1917), and Kamm v. Pritchard, 296 F. 871 (5th Cir.1924). We are told that in Wells the court held that the buyer's sale of steamers after making a contract to purchase coal for one year did not relieve the buyer from the obligation to take coal that the ordinary and accustomed use of the steamers required. In Great Lakes the court held that a contract carried with it an implied obligation on the part of the buyer to continue its business during the term of the contract and run its boats in a reasonable manner. And in Kamm the court held that although a contract to sell the defendants' output of lumber contained no covenant by the defendants not to sell their entire lumber operation, the contract was nevertheless enforceable by the plaintiff
 
 
 [14]
 In this case the very purpose behind forming the cooperative Tri-State system to provide electric power to rural users at a reasonable cost is obviously undercut if Tri-State raises the rates charged to its members simply to take into account the possibility that the members will sell out and have no requirements. Also, the rationale stated undercuts the cooperative, nonprofit nature of the whole Tri-State system
 
 
 [15]
 We do not decide how the contract governs the rights and liabilities of the parties in a situation where a cooperative member becomes financially unable to continue to service its customers. The record is clear that Shoshone is not in such a position
 
 
 [16]
 Cf. Upper Missouri G & T Electric Cooperative, Inc. v. McCone Electric Co-op, Inc., 160 Mont. 498, 503 P.2d 1001, 1004 (1972) (quoting Upper Missouri G & T Electric Cooperative, Inc. v. McCone Electric Co-Op, Inc., 157 Mont. 239, 484 P.2d 741, 747 (1971)) ("Ten years after the [wholesale power] contract, initiated and inspired, we are told, by defendant [McCone], defendant [McCone] now wants a better deal elsewhere. It is as simple as that.")
 
 
 [17]
 We note that the General Power Contract Provisions, which have been incorporated into the all-requirements contract, expressly state that Shoshone is not in default under the all-requirements contract if Shoshone is prevented from fulfilling its obligations under the contract by reason of uncontrollable forces, i.e., causes beyond Shoshone's control, which by due diligence and foresight Shoshone could not reasonably have been expected to avoid
 
 
 [18]
 Of course, the loss of a member such as Shoshone would result in a loss of an all-requirements contract that could have been extended and thus looked to as additional security if Tri-State needed to obtain additional loans to maintain and operate its system. However, there is no assurance that Shoshone would have agreed to further extend the term of the contract to match additional loan repayment periods
 If Tri-State is awarded monetary damages for Shoshone's breach, we also do not think that Tri-State's financial position or strength will be adversely affected to the point of terming Tri-State's legal remedy "inadequate."
 
 
 [19]
 As mentioned, Dr. Rhodes relied on several assumptions and forecasts in arriving at his conclusions. The past has shown, however, that the electric power market is volatile and somewhat unpredictable. In fact, this very lawsuit stems from problems with the accuracy of certain power forecasts. Also, although Tri-State is presently in a surplus situation, that could change at any time. And Shoshone's power requirements and even the rates charged under the contract could vary considerably over the remaining term of the contract. The unpredictability of the electric power market and the variability of Shoshone's requirements over the next 32 years could create a real problem in determining damages with any reasonable degree of accuracy. However, we do not find anything in the record establishing the uncertainty of calculation. We have only Dr. Rhodes' expert testimony, which appears to be sound in light of the fact that there is no contradictory evidence
 
 
 [20]
 We noted earlier that the district court granted a new trial on all issues. Because the determinations on this appeal have rendered unnecessary a new trial on the issue of liability, it appears that the new trial will be limited to the issue of damages
 
 
 [1]
 The district court also determined that the $15 million punitive damage award "was improper, as well as shocking to the conscience of the Court." Rec. vol. III, doc. 288 at 5
 
 
 [2]
 The court's opinion is confusing on this point. After saying that the district court discussed the contract question in its order denying permanent injunctive relief, the court then says that the contract question does not need to be decided, insofar as permanent injunctive relief is concerned, because there is no irreparable injury to warrant such relief. Maj. op. at 1352. The court next says, however, that it is deciding the contract question because the district court mentioned it in denying permanent injunctive relief and the district court heard evidence at trial in accordance with its view of the contract. Id. at 13 n. 7. Either the court is deciding the contract question in connection with our review of the denial of permanent injunctive relief or it is deciding the contract question for some other reason, presumably judicial economy, under principles of pendent appellate jurisdiction
 
 
 [3]
 Wyo.Stat.Ann. Sec. 34-21-223 (1977) provides:
 Output, requirements and exclusive dealings.
 (a) A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of any estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.
 (b) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and the buyer to use best efforts to promote their sale.
 Good faith is defined as follows:
 (xix) "Good faith" means honesty in fact in the conduct or transaction concerned:
 Wyo.Stat.Ann. Sec. 34-21-120 (1977).
 
 
 [4]
 Although the authors acknowledge that one court has implied a duty to remain in business, they suggest that finding such a duty, merely because the parties have entered into a requirements contract, results in the court constructing a contract for the parties. A. Squillante & J. Fonesca, Williston on Sales Sec. 10-4 at 386
 
 
 [5]
 An ambiguous contract is one which is obscure in its meaning because of indefinite expression or because the expression is capable of double meaning. Amoco Production Co. v. Stauffer Chemical Co. of Wyoming, 612 P.2d 463, 465 (Wyo.1980)