**BCI TELECOM HOLDING, INC. Plaintiff,**

v.

**JONES INTERCABLE, INC., Jones International, Ltd., Jones Internet Channel, Inc. and Glenn R. Jones, Defendants.**

No. Civ. A. 98–M–224.

United States District Court, D. Colorado.

May 5, 1998.

James M. Lyons, Rothgerber, Appel, Powers & Johnson, Denver, CO, for Plaintiff.

Miles Cortez, Cortez Macaulay Bernhardt, Tucker K. Trautman, Ireland Stapleton & Pascoe, Denver, CO, Defendants.

**MEMORANDUM OPINION AND ORDER**

MATSCH, Chief Judge.

In this civil action, brought under the diversity jurisdiction provided by 28 U.S.C. § 1332, BCI Telecom Holding, Inc. ("BCI"), formerly Bell Canada International, Inc.,

seeks an injunction to enforce the provisions of a Shareholders Agreement by preventing the defendant Jones Intercable, Inc. ("Intercable") and defendant Jones Internet Channel, Inc. ("Jones Internet"), a wholly owned subsidiary of Jones International, Ltd. ("Jones International"), a business owned by defendant Glenn R. Jones, from any expansion of an Internet service to Intercable's subscribers unless and until an appropriate contract has been approved by "Unrelated Directors" of Intercable according to the terms of that Shareholders Agreement. The complaint was filed on February 2, 1998, with a motion for a preliminary injunction. Briefs were submitted supporting and opposing that motion. A hearing was held on March 23, 1998. The hearing was continued on April 7 and 8. In the course of the hearing, at the suggestion of the court, the parties agreed to submit the claim for injunctive relief on the merits, separating it from the other claims in the complaint. Accordingly, the procedural posture of the case is that there has been a complete trial on the merits on a claim for a permanent injunction with a final order to be entered under Fed.R.Civ.P. 54(b).

■ This is a dispute about corporate governance. Specifically, the plaintiff, a principal stakeholder in Intercable, claims that its investment in that company has been jeopardized by a split vote of the board of directors on December 23, 1997, approving a resolution interpreting the Shareholders Agreement to permit Jones Internet to connect Intercable subscribers to an Internet service because it constitutes "programming" and "packaging" within a limited exception to the general requirement that transactions with businesses affiliated with either the BCI companies or the Jones companies must be approved by the "Unrelated Directors," as defined in Section 3.6 of the Shareholders Agreement. The plaintiff contends that the board's resolution is contrary to the plain meaning of the Shareholders Agreement. The defendants answer that a majority of the whole board correctly interpreted that contract, that the court must defer to the business judgment of the board, and that Intercable will benefit from this new service to be provided to its subscribers through Jones Internet.

The relevant facts are not disputed. Differing views of the significance of particular facts to the rights and responsibilities of the parties expressed in contract language that is not clearly descriptive of the business opportunities being developed by Jones Internet are the core elements of this case.

Adjudication of the conflicting interpretations of the Shareholders Agreement must begin with recognition that it was drafted, negotiated, and signed to provide a procedural framework for orderly governance of a publicly held Colorado corporation engaged in the highly competitive, rapidly changing communications industry with its major shareholders doing business in the same industry, having independent financial interests that could benefit from transactions with the company in which they have a shared investment. Shareholders' agreements in such situations may prevent paralysis from unresolved disputes over claims of conflicting interests and can avoid any unfair use of the company's assets to the disadvantage of the shareholders as a whole.

Intercable's three largest shareholders are Glenn Jones, Jones International, and BCI. The remainder of the stock is held publicly and traded over NASDAQ. Intercable is among the ten largest cable television companies in the United States, operating systems in 19 states, serving some 1,400,000 subscribers.

Plaintiff's Exhibit 8, the Jones International Corporate Fact Sheet, provides pertinent background information about the defendants. Glenn Jones purchased a cable television business in Georgetown, Colorado for $12,000 in 1967. After acquiring other cable systems, he incorporated Jones International to act as a holding company for all of his cable related businesses. Glenn Jones is the sole owner of Jones International, which now wholly owns more than twenty subsidiary companies actively engaged in the communications industry. Mr. Jones organized Intercable in 1970 as a Jones International subsidiary.

BCI is a subsidiary of BCE Inc., Canada's largest telecommunications company. BCI provides consulting and investment services

in the international telecommunications industry.

BCI and Intercable were in a cable telephony joint venture in London, England in the early 1990's. Pat Lombardi of Intercable approached representatives from BCI in the Fall of 1993 to discuss the possibility of investment in Intercable. After extensive negotiations, BCI, in 1994, agreed to purchase a 30% equity interest in Intercable together with an option to attain a controlling ownership position seven years later. BCI paid roughly $260,000,000 for its stock and about $54,000,000 for the control option. BCI also committed an additional $140,000,-000 to maintain its 30% stake in Intercable.

The Shareholders Agreement was an integral part of BCI's structured investment in Intercable. BCI, Glenn Jones, Jones International, and Intercable signed that comprehensive contract on December 20, 1994. It was approved at the December 19, 1994, shareholders meeting, thereby becoming part of the organizational structure of Intercable.

The Shareholders Agreement provides that BCI may "designate" three of Intercable's thirteen directors and Mr. Jones' companies may designate seven directors. The remaining three directors are to be designated jointly by Jones and BCI. Each of the major shareholders agreed to vote for the other's designees and the three joint designees. The directors now in office have been selected under these provisions. Although the publicly held shares have voting rights, they have no practical power to elect any directors of Intercable.

The parties to the Shareholders Agreement recognized that Intercable had routinely done business with other companies owned by Glenn Jones. When BCI made its investment, Intercable had affiliate agreements either in place or in process with Mind Extension University, Inc., Jones Computer Networks, Inc., Product Information Networks, and Health Care Network for carriage of programming. Other affiliate agreements related to property leases and support services. These agreements were listed in Schedule I attached to the Shareholders Agreement.

Recognizing the strong possibility of future transactions between Intercable and the principal shareholders or their affiliates, the parties agreed on a procedure to assure a fair evaluation of proposed affiliate transactions. Section 3.6 of the Shareholders Agreement provides for continuation of the existing Jones affiliate agreements and for consideration of proposed related transactions in this language:

3.6. *Transactions with Affiliates,* (a) Investor acknowledges that prior to the date hereof certain services have been provided by the Intercable Group Entities to the JI [ (Jones International) ] Group Entities and by the JI Group Entities to the Intercable Group Entities. Investor [ (BCI) ] agrees that the services described in the Affiliate Agreements or the Current SEC Filings (as defined in the Stock Purchase Agreement) may continue to be provided for a period of eight years following the date hereof, on terms and conditions consistent with those described in such Current SEC Filings or as set forth in the Related Agreements.

· (b) **Except for transactions described in Section 3.5 or paragraph (a) of this Section 3.6, or undertaken pursuant to the terms of the Related Agreements or the Affiliate Agreements, each Shareholder agrees that neither it nor any of its Affiliates will engage in any transaction, or enter into, amend in any material respect or renew any agreement, with an Intercable Group Entity unless the material terms of such transaction are fully and fairly disclosed to the Board, and approved by a majority of the Unrelated Directors.**

(c) **For purposes of this Agreement "Unrelated Directors" means:**

(i) **in the case of a transaction or agreement between an Intercable Group Entity and a JI Group Entity, the three Investor Nominees and the three Joint Nominees,**

(ii) in the case of a transaction or agreement between a BCE Group Entity and an Intercable Group Entity, the directors that are not Investor Nominees, and

(iii) in the case of a transaction or agreement among an Intercable Group Entity, a JI Group Entity and a BCE Group Entity, the directors that are Independent Directors.

(emphasis added).

Section 3.5 of the Shareholders Agreement makes an exception to these requirements in the following language:

3.5. *Programming Services.* **Notwithstanding any other provision in this Agreement to the contrary: (a) The JI Group Entities shall have the right to distribute, on a full-time** (or, if requested from time to time by Jones or International, part-time, to be extended or restored, as applicable, to full-time upon his or its request), **daily basis, programming packaged (as opposed to brokered) by, created by or created primarily for a JI Group Entity ("Jones Programming") on such number of channels (not to exceed six at any one time) on the Systems as Jones or International may designate from time to time** (with the Mind Extension University programming to be carried on a VHF channel (*i.e.,* channel 2 through 12)). The Bell International Group Entities shall have the right to distribute, on a full-time (*or, if requested from time to time by Investor, part-time to be extended or restored, as applicable to full time upon Investor's request*), daily basis, programming packaged (as opposed to brokered) by, created by or created primarily for a Bell International Group Entity ("Investor Programming") on such number of channels (not to exceed two at any one time) on the Systems as Investor may designate from time to time.

(b) Prior to exercising its distribution right *with respect to any programming* under this Section 3.5, the relevant JI Group Entity or Bell International Group Entity (each a "Programmer") will present to the Board a reasonably detailed business plan that, among other things, describes (i) the general content of such programming, (ii) the marketing strategy for such programming, including service level (such as basic, tier or a la carte) and (iii) pricing for such service levels. The Jones Programming and the Investor Programming shall be carried and priced by the Intercable Group Entitles on such level or levels of services as such programming is intended to be carried under the business plan for such programming.

(c) Notwithstanding the rights granted pursuant to paragraph (a) above:

(i) the Intercable Group Entities shall not be required to delete from any System any programming acquired from any third-party programmer prior to the expiration of the term of the program carriage agreement with such third-party programmer in order to carry any Investor Programming or Jones Programming,

(ii) in the event there is insufficient channel capacity to carry Jones Programming or Investor Programming, carriage of such Jones Programming or Investor Programming on a System shall be given priority over any third party programming not then carried by such System and over any third party programming then carried by the System at such time as the initial or then current renewal term, as applicable, is scheduled to expire, *provided* that (x) such priority shall not apply to off-air programming carried by the four major broadcast networks or as mandated by law, or the 20 most widely viewed third party programs as then carried by the System at the time as reported by Cablevision magazine, and (y) in addition to the foregoing requirements; the Company shall use its reasonable best efforts to add Jones Programming and Investor Programming to the Systems whenever opportunities to do so arise,

(iii) in the event there is insufficient channel capacity to carry both the Jones Programming and Investor Programming, Jones Programming will be given priority over carriage of Investor Programming,

(iv) Jones, International and Investor, as the case may be, shall give the Company at least four months' prior notice of any proposed commencement or termination of use of any channel and

(v) the Bell International Group Entities shall have no rights under this Section 3.5 to distribute programming that has sub-

stantially similar content as any Jones Programming.

(d) **During the Validation Period (as defined herein), the license fee payable by the Intercable Group Entities for any unit of Jones Programming** (excluding Mind Extension University, Health Care Network, Jones Computer Network and Product Information Network) or Investor Programming ("New Programming") **shall be such license fee as the Programmer establishes in good faith based on its reasonable estimate of the market value of such New Programming.** A Programmer shall notify the Company and the Independent Directors in writing promptly following the end of the Validation Period whether the Programmer has entered into an agreement providing for (a) the distribution of such New Programming by a cable television operator or other distributor of video programming (a "Distributor") having at least 400,000 subscribers ("Validating Distributor") and (b) the payment of a license fee by such Validating Distributor at a rate equal to or greater than the license fee payable by the Intercable Group Entities ("Validating Programming Agreement"). **If no Validating Programming Agreement has been entered into during the Validation Period, the Company or any Independent Director may, by written notice given within sixty (60) days after receipt by the Company and the Independent Directors of the above-referenced notification, require that such Programmer reduce the license fee payable by the Intercable Group Entities for such New Programming to the greater of (i) a license agreement approved by the Independent Directors,** (ii) the average license fee charged by the applicable Programmer to all Distributors for such New Programming and (iii) the Agreed Rate in effect at such time. For purposes of this Section 3.5, "Agreed Rate" means, at any time, the rate set forth in the Affiliate Agreement between mind Extension University, Inc. and the Company dated December 28, 1993, as amended as of June 1, 1994. Thereafter, the license fee payable by the Intercable Group Entities for such New Programming shall be sub-

ject to such adjustments as are similar to adjustments in the license fee permitted by the Validating Programming Agreement or, if there is no such agreement in effect, by the programming agreement pursuant to which such New Programming is carried by the largest Distributor serving fewer than 400,000 subscribers. A Programmer may elect at any time to terminate carriage of such unit of New Programming upon not less than ninety days prior written notice to the Company if it does not enter into a Validating Programming Agreement during the Validation Period. **"Validation Period" shall mean, as to any new Programming, the fifteen (15) month period commencing with the first month with respect to which a license fee is payable by an Intercable Group Entity for the right to distribute such New Programming.**

(e) The Intercable Group Entities shall carry Jones Programming and Investor Programming on the Systems for a period of 15 years after the date hereof (or the expiration date of the applicable programming agreement with the Company) in accordance with this Section 3.5, provided that if Investor does not purchase the Optioned Shares pursuant to the Option Agreements, the rights of the Bell International Group Entities will terminate on the Option Termination Date.

(f) No JI Group Entity nor any Bell International Group Entity may sell or assign (other than to an Affiliate) its unused right of distribution to the Systems pursuant to this Section 3.5, *provided* that in the event any Programming is being distributed pursuant to this Section 3.5, such Programming will continue to have the distribution rights provided herein if the relevant JI Group Entity sells or assigns (i) any network or networks carried on a System or any such Programming or (ii) any entity directly or indirectly owning or controlling such network(s) or Programming. In the event of any such sale or assignment by a JI Group Entity or a Bell International Group Entity, the continuing distribution rights of such Programming will count towards the number of channels

permitted to be designated by such JI Group Entity or Bell International Group Entity pursuant to paragraph (a) above.

(g) Each of Investor and International shall use reasonable best efforts to cause its designees to the Board, subject to their fiduciary duties under applicable law as advised by counsel, to approve the carriage by the Intercable Group Entities of the other party's Programming in accordance with this Section 3.5.

(emphasis added).

Section 2.2(b) defines an Independent Director as "a person who is free from any relationship that would interfere with the exercise of independent judgment by such person as a member of the Board," and gives examples of relationships which prevent a director from being independent unless the board unanimously determines otherwise.

Without the Shareholders Agreement, business transactions with companies affiliated with these principal shareholders would be clouded with uncertainty because Intercable is a Colorado corporation, governed under the Colorado Business Corporation Act ("CBCA"), which has a less than clear provision for "conflicting interest transactions." *See* C.R.S. § 7–108–501(1)(a)(III). Under that statute, such a transaction is lawful if the material facts are disclosed and the transaction is approved by a majority vote of the shareholders or disinterested directors, or if the transaction is "fair to the corporation." C.R.S. § 7–108–501(2)(a)–(c). There are no authoritative interpretations of this statute in reported Colorado court opinions. The Shareholders Agreement replaces this uncertainty with the specified procedure for approving conflicting interest transactions.

The Shareholders Agreement departs from the CBCA in three material respects. First, under the CBCA, an interested party transaction will be upheld if shown to be "fair." C.R.S. § 7–108–501(2)(c). The Shareholders Agreement requires approval of the Unrelated Directors. They determine its fairness. Second, the Shareholders Agreement specifically identifies the directors who compose the slate of Unrelated Directors. The CBCA does not define the term "disinterested director." The record in this case does not give enough information about Intercable's directors to know how many may be "disinterested" in a Jones Internet transaction, whatever working definition of that term is used. It is assumed that there are more "disinterested directors" than the six "Unrelated Directors." In fact, the defendants posit that at least eleven of the thirteen Intercable directors should be classified "disinterested" with respect to the Jones Internet transaction.

The third and most important difference between the Shareholders Agreement and the Colorado statute is that the principal shareholder not involved in the transaction has the power to block it through its representation on the panel of Unrelated Directors. When a BCI affiliate proposes a transaction with Intercable, seven of the ten Unrelated Directors are Jones' designees. When a Jones affiliate seeks to transact business with Intercable, three of the six Unrelated Directors are BCI's designees. Thus, each principal shareholder has the power to prevent the other from taking undue advantage of the company. The parties adopted this balance of power as a governing principle.

■ The dispute in this case is about the application of the corporate governance structure established in the Shareholders Agreement to Jones Internet Channel ("Internet Channel"), a creation of Jones Internet which is a subsidiary of Jones International. In brief, the Internet Channel is an Internet service provider that enables a subscriber to gain access to the Internet over the cable system rather than the telephone lines. Subscribers must order and pay for this service as they would for premium channels like HBO and Cinemax. Depending on which Intercable system is involved, the Internet Channel costs either $19.95 or $39.95 per month. The Internet Channel was launched on Intercable's system in Alexandria, Virginia in February 1996, and has subsequently been made available to subscribers in Manassas, Virginia. Jones Internet wants this service to be made available to all Intercable subscribers during the next two to three years. Intercable's board of directors has not yet approved any contract or specific

business transaction with Jones Internet. Mr. Jones and his companies claim the right to distribute this service as programming under Section 3.5 of the Shareholders Agreement. BCI contends that this service does not fit within the programming exception and that any such business agreement between Intercable and Jones Internet must be approved by the Unrelated Directors under Section 3.6.

The Supreme Court succinctly described the worldwide computer communication system known as the "Internet" in *Reno v. ACLU*, — U.S. —, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997). Access to the Internet is available from many different sources. There are competing "online services" that offer their subscribers access to their separately developed proprietary networks together with "links" to the entire Internet. Vast files of information are stored in computers throughout the world and are available to other computers through the World Wide Web. To navigate the Web, users may type in the known address of a home page or type one or more key words, using a commercial search engine to locate sites on subject matter of interest to them. Web pages commonly include "links" that lead to information located elsewhere on the Internet.

The transmission methodology used to develop the Internet has been telephone lines. Cable television developed through the use of coaxial and fiber optic cables capable of sending signals much faster than the copper wire used in local telephone lines. The use of broadband cable to access the Internet communication system provides the advantage of speed and avoids the need for a dedicated telephone line.

At trial, the Chief Technical Officer for Jones Internet Channel agreed that it is one of hundreds of Internet service providers giving access to the Internet. As such, it links a subscriber's personal computer to the international network of interconnected computers via the broadband cable traditionally used to deliver cable television service. That requires splitting the cable as it enters the subscriber's home to connect it both to the television set and to the personal computer. Subscribers must be provided with a special cable modem to transform the transmitted signals going into and out of the computer. The subscriber receives information from the Internet over the broadband cable, and depending on the capability of Intercable's system in the relevant market, the subscriber transmits information either over a phone line in a "one-way system," or through a "two-way" cable in a "two-way system." For both systems, Intercable is required to make changes at its regional headend facilities to make the Internet Channel available to its subscribers.

As demonstrated at trial, subscribers in the Manassas, Virginia market turning to the Internet Channel first see the "DCtoday" Homepage. It displays news headlines, the current weather conditions, and notations of the availability of a community events calendar and financial news. Subscribers can click to provider prepared information about local restaurants, businesses, events, weather, and even little league sports teams. The Internet Channel also furnishes subscribers with brief descriptions of links to various Internet sites in selected categories such as news, sports, stock market reports, and computers. The local information and the selected sites on the Internet Channel are updated weekly. The Internet Channel also provides a chat room and online games, together with features for sending personalized electronic greeting cards and for creating an individual web page. Jones Internet Channel provides its own encyclopedia.

The entire Internet is available through the Internet Channel selectively, by the links provided with DCtoday's service, and indiscriminately, through use of Internet addresses or search engines, to the innumerable sites not identified by the Internet Channel.

The witnesses in this case, basing their testimony on their own experience and understanding of the rapidly changing two-way communications industry, gave conflicting views on whether the Jones Internet Channel should be classified as "programming" or "packaging" as contrasted with "transmission." All agreed that it is different from the normal fare of television viewing offered by cable TV. The degree and quality of the difference can best be measured by reference

to what Jones Internet says in its offer of the service to the Washington, D.C. area on its DCtoday Homepage on the Internet. Plaintiff's Exhibit 63 contains the following pertinent paragraphs:

> DCtoday is a regional, community web site that serves as a Jones Internet Channel subscriber's gateway to the World Wide Web. DCtoday is accessible to all Internet users, but some content is exclusive to Jones Internet Channel subscribers.
>
> find out if you can **get connected now!**
>
> We deliver *more* for less. Using cable modems and the same broadband network that brings cable TV into your home, Jones Internet Channel delivers the Internet to your computer *faster than fast* at a monthly cost of **less than $40.**
>
> If you're wired for Jones Communications' basic cable television service and live in the DC region, use this form to see if you're ready to step into the Internet express lane with high-speed access via cable modem.
>
> Don't have cable TV? Please, *find out how to get connected.*

(all emphasis is original).

The advantage of access to the Internet through DCtoday is emphasized in these paragraphs from the DCtoday Homepage example included in Defendants' Exhibit W.

> Most regular telephone modems can access data no faster than 28.8 tiny kilobits per second. But the state-of-the-art Jones fiber optic and coaxial cable network allows cable modems to receive up to several megabits per second. What does that mean in plain English? Cable is *your* HOT wire connection to the Internet.
>
> Cable modems are faster AND less expensive than what an ISDN, T1 or T3 line would cost you. If you were to go out and buy the computer equipment required to approximate the speed of a cable modem, you'd end up paying up to $3000, plus monthly access charges of around $1000. Jones Internet Channel provides a sensible, affordable alternative.
>
> We deliver *more for less.* Using cable modems and the same broadband network that brings cable TV into your home, Jones

Internet Channel delivers the Internet to your computer faster than fast at a monthly cost of less than $50.

> That's more speed than the telephone company's ISDN lines can handle, at a much lower price.
>
> But that's not all! In addition to a cable modem and unlimited high-speed access, Jones Internet Channel subscribers receive full online service including build your own personal web pages, a searchable community calendar, e-mail, chat, newsgroups and more. We offer professional in-home installation, a free licensed copy of Netscape software and, for desktop PC users, an Ethernet card. Some restrictions apply. For technical support please call 1–888–JONES–IC.

The Section 3.5 exception to the requirement of approval by Unrelated Directors in Section 3.6 is limited to programming packaged by or created by or for Jones companies. The Jones Internet Channel includes such programming and packaging. The copyrighted pages presented to the subscribers is programming and the provision of links to Web sites can be considered packaging.

What is controlling in this case is that the primary benefit to the subscribers is the speed of access to the Internet and its unlimited stores of information and opportunities for communications through computer connections. The programming rights reserved to Jones entities in Section 3.5 are of the type expressly excluded from the license fee provision in subsection 3.5(d). They are Mind Extension University, Health Care Network, Jones Computer Network and Product Information Network. The Jones Internet Channel is unlike any of this programming; it involves a very different form of transmission of communications through the cable systems. The modifications that must be made at the receiving end in the subscribers' homes are the best demonstration of this central fact. Because much more than programming is being offered, the Section 3.5 exception is not applicable. Any business arrangement between any Jones entities and Intercable for the Jones Internet Channel must be approved by the Unrelated Directors under Section 3.6.

The defendants rely on a legal opinion from a law firm retained by the Intercable board that reached a different conclusion. The error in that firm's analysis was the creation of a false dichotomy between the language of Section 3.5 and Section 3.3, which described the "core business" of Jones Intercable for the purpose of imposing an obligation on the principal investors to refer business opportunities to the company. Section 3.3 has no relevance to this case.

The defendants have also argued for the application of the business judgment rule, requiring the court to defer to the judgment of the entire board in adopting the resolution at the board meeting of December 23, 1997, as follows:

> RESOLVED, that the Board of Directors of the Corporation hereby concludes that the services provided and to be provided by Jones Internet Channel, Inc. are "Jones Programming" within the ambit of Section 3.5 of the Shareholders Agreement, and may be provided to the Corporation on a "channel" thereunder.

The business judgment rule is not applicable because the resolution makes an interpretation of the Shareholders Agreement and that is a legal issue which the court is obligated to resolve. It is not dependent upon any fact-finding or business decision of the board. What is decided here is that the board's decision that it may proceed to deal with Jones Internet under Section 3.5 of the Shareholders Agreement is an anticipatory breach of that contract.

Entry of a permanent injunction prohibiting the defendants from proceeding further with any "rollout" of the Jones Internet Channel on any of the Jones Intercable systems unless and until approval of the Unrelated Directors has been obtained is nothing more than specific performance of the Shareholders Agreement. That equitable remedy must be applied to prevent irreparable injury when damages cannot adequately compensate for injuries caused by the breach. *Tri-State Generation & Transmission Ass'n, Inc. v. Shoshone River Power, Inc.,* 874 F.2d 1346, 1353–54 (10th Cir.1989). This is such a case. The parties recognized that in Section 7.3 of the Shareholders Agreement as follows:

> Each party hereto agrees that a Shareholder could be irreparably damaged if any party failed to perform any obligation under this Agreement, and that such Shareholder would not have an adequate remedy at law for money damages in such event. Accordingly, each Shareholder shall be entitled to specific performance and injunctive and other equitable relief to enforce the performance of this Agreement.

That is, of course, not binding on this court in its obligation to determine whether the equitable remedy of injunctive relief is appropriate. The evidence fully supports such a finding. There is no recognized measure of loss for the failure to proceed according to the governing principle in Section 3.6. Moreover, the uncertainties about the future of the Internet make it impossible to quantify damages.

Upon the foregoing, it is

ORDERED that the resolution adopted by the board of directors of Jones Intercable, Inc. on December 23, 1997, is invalid because it is contrary to the Shareholders Agreement. It is

FURTHER ORDERED that none of the directors, officers, employees or agents of Jones Intercable, Inc., or any of the named defendants in this civil action shall proceed further with any expansion of the Jones Internet Channel or any similar Internet service provider business of any Jones entity as "Jones Programming" within Section 3.5 of the Shareholders Agreement, and that any future proposal for such a business relationship between a Jones entity and Jones Intercable, Inc. shall be undertaken only with the approval of the Unrelated Directors as defined in Section 3.6 of the Shareholders Agreement. It is

FURTHER ORDERED that there is no just reason for delay in the entry of a final judgment of permanent injunction, and the Clerk is ordered to enter final judgment pursuant to Fed.R.Civ.P. 54(b).

## JUDGMENT

Pursuant to the Memorandum Opinion and Order by Chief Judge Richard P. Matsch dated May 5, 1998, it is

ORDERED AND ADJUDGED that the resolution adopted by the board of directors of Jones Intercable, Inc. on December 23, 1997, is invalid because it is contrary to the Shareholders Agreement. It is

FURTHER ORDERED AND ADJUDGED that none of the directors, officers, employees or agents of Jones Intercable, Inc., or any of the named defendants in this civil action shall proceed further with any expansion of the Jones Internet Channel or any similar Internet service provider business of any Jones entity as "Jones Programming" within Section 3.5 of the Shareholders Agreement, and that any future proposal for such a business relationship between a Jones entity and Jones Intercable, Inc. shall be undertaken only with the approval of the Unrelated Directors as defined in Section 3 .6 of the Shareholders Agreement.